**203 F.Supp.2d 985**
**AT & T WIRELESS PCS, INC., Plaintiff**
**v.**
**TOWN OF PORTER Defendant**
**No. 2:99 CV 463.**
**United States District Court, N.D. Indiana, Hammond Division.**
**March 21, 2002.**
**Page 986**

Thomas J. Brunner, Jr., Baker and Daniels, South Bend, IN, Alison G. Fox, Baker

Page 987

and Daniels, Gregory H. Furda, Sidley & Austin, Chicago, IL, Joel E. Hammerman, Sidley Austin Brown and Wood, Chicago, IL, for Plaintiff.

Rehana R. Adat, Spangler Jennings and Dougherty PC, Merrillvile, IN, Edward W. Hern, Sprangler Jennings and Dougherty PC, Valparaiso, IN, for Defendant.

William R. Kirschner, U.S. Department of Justice, Federal Programs Branch, Civil Division, Washington, DC, for Intervenor.

ORDER

MOODY, District Judge.

Plaintiff AT & T Wireless PCS, Inc. ("AT & T") brings this action pursuant to 47 U.S.C. § 332(c)(7)(B)(v), a provision of the Telecommunications Act of 1996 (the "TCA" or simply the "Act"), seeking injunctive relief requiring defendant the Town of Porter, Indiana, ("Porter"), to grant a zoning variance allowing AT & T to construct a telecommunications facility (a 190' tall monopole tower) at a site in Porter. Subsection 332(7) of the TCA, entitled "[p]reservation of local zoning authority," among other requirements mandates that state and local regulation of the placement and construction of personal wireless service facilities must not unreasonably discriminate against providers of functionally equivalent services (§ 332(c)(7)(B)(i)(I)); must not prohibit or have the effect of prohibiting personal wireless services (§ 332(c)(7)(B)(i)(II)); and, for decisions denying a request to construct or modify a facility, the decision must be in writing and supported by substantial evidence contained in a written record (§ 332(c)(7)(B)(iii)).

Any person adversely affected by state or local governmental action violating any of the above requirements of § 332(7) may bring suit in a court of competent jurisdiction. § 332(c)(7)(B)(v). In its complaint, AT & T alleges that the Town of Porter, Indiana, ("Porter") acting through its Board of Zoning Appeals ("BZA"), violated the requirements of § 332(c)(7) when it denied a zoning variance necessary to allow AT & T to construct a telecommunications tower in the town without basing that decision on substantial evidence. In addition, AT & T contends that Porter violated the TCA by unreasonably discriminating against AT & T and in favor of other providers already allowed to place communications towers on the real estate in question, and by adopting a de facto ban on the construction of additional wireless telecommunications facilities in Porter.

Porter has filed two motions to dismiss the complaint, one of which argues that the court lacks subject-matter jurisdiction to hear the case, and the other that the complaint fails to state a claim because the relevant provisions of § 332(c)(7) are an unconstitutional commandeering of the state in violation of the tenth amendment. The parties have also filed cross motions for summary judgment going to the merits of the dispute. If the case can be decided on the merits in Porter's favor, the court should do so to avoid unnecessary resolution of the constitutional issue Porter raises. Indiana Port Commission v. Bethlehem Steel Corp., 835 F.2d 1207, 1210 (7th Cir.1987).

In addition, as part of its opposition to AT & T's summary judgment motion, Porter has filed a motion to strike certain exhibits (deposition testimony of Porter representatives) and portions thereof (the affidavit of James Kopeny) submitted in support of AT & T's motion for summary judgment, as well as those portions of AT & T's statement of undisputed facts based on those exhibits. Briefly, Porter contends that because the court's review in this case is limited to the written record of proceedings before the BZA, the court cannot consider these materials. In addition, Porter argues that Kopeny's affidavit

Page 988

is riddled with flaws, e.g., hearsay, improper summarization of other evidence before the court, etc., and so those portions may not be considered by the court.

The court's consideration of AT & T's claims of unreasonable discrimination, and of a ban on telecommunications facilities, is not limited to the written record of the BZA's proceedings. See Town of Amherst v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 16 n. 7 (1st Cir.1999). In addition, although the TCA requires the BZA's decision to be supported by substantial evidence in a written record, there is no provision in the TCA expressly limiting this court's review of the case to that evidence. As a result, the court believes it can consider additional evidence relevant to understand the BZA's decision. Last, although the court agrees that portions of Kopeny's affidavit are improper (see, e.g., ¶ 37: "it is my opinion that the [Porter] BZA denied AT & T's application not for the reasons asserted . . . but based on a de facto moratorium on the construction of additional telecommunications facilities"), the court is able to separate the wheat from the chaff and consider only the appropriate portions of the affidavit. For these reasons, Porter's motion to strike will be denied.

Motion to Dismiss for Lack of Subject-matter Jurisdiction

Porter argues that this court lacks subject-matter jurisdiction because AT & T has not exhausted its administrative remedies by availing itself of the certiorari procedure under § 36-7-4-1003 of the Indiana Code, which allows persons aggrieved by illegal zoning decisions to seek a judicial remedy. Porter argues that "[u]nder Indiana law (I.C.4-2-21.5-5-4), a requirement to filing for judicial review of an administrative agency determination is the exhaustion of all administrative remedies . . . ."1 Brief at 2. However, Porter points to no similar provision under federal law, the TCA or cases interpreting the TCA, similarly requiring exhaustion of state remedies before bringing suit under § 332(c)(7)(B)(v) of the Act.

Instead, Porter argues that Scudder v. Town of Greendale, Indiana, 704 F.2d 999, 1002 (7th Cir.1983), by implication holds that "exhaustion of state remedies is required in a federal action other than a section 1983 claim." Brief at 4. In Scudder the plaintiff was denied a building permit. Instead of appealing to the board of zoning appeals, an administrative prerequisite to pursuing certiorari in the Indiana courts, the plaintiff filed a § 1983 action in federal district court alleging a conspiracy to deny him of his constitutional right to use and enjoy his property. The district court granted summary judgment to the defendant on the ground that the plaintiff had failed to exhaust his state remedies, Id. at 1001, and plaintiff appealed.

The court of appeals stated that subsequent to the district court's decision, Patsy v. Board of Regents of the State of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), made it clear that exhaustion of state remedies is not required before bringing a § 1983 action, invalidating the district court's rationale for granting summary judgment. Nevertheless, the court affirmed the district court's decision on other grounds in the record showing that the plaintiff's complaint failed to state a claim. Contrary to Porter's assertion,

Page 989

Scudder does not somehow imply that a general exhaustion requirement exists outside of § 1983 litigation. Scudder simply has no bearing on that issue.

The only possible support for Porter's argument is found in the text of § 332(c)(7)(B)(v) itself, which allows suit by any person adversely affected by any "final action" of a state or local government that contravenes the requirements of § 332(c)(7). In its reply brief Porter argues for the first time that the decision of the Porter Board of Zoning Appeals was not "final," because subject to modification by court order obtained through the certiorari process provided by Ind.Code § 34-7-4-1009. Although the court typically will not address arguments made for the first time in a reply brief, it will do so here because AT & T anticipated and discussed the issue in its memorandum responding to Porter's motion to dismiss.

The TCA nowhere defines the term "final action" as used in § 332(c)(7)(B)(v). The few courts that have considered the issue, see, e.g., Laurence Wolf Capital Mgmt. Trust v. City of Ferndale, 176 F.Supp.2d 725, 727 (E.D.Mich.2000), have observed that the legislative history of the Act states that "the term `final action' . . . means final administrative action at the State or local government level so that a party can commence action under the subparagraph rather than waiting for the exhaustion of any independent State court remedy otherwise required." H.R.Conf. No. 104-458, 104th Congress, 2d Sess. 208 (1996) reprinted in 1996 U.S.S.C.A.N. 124, 223 (emphasis added). Courts have found that Congress's purpose in enacting § 332(c)(7)(B)(5) was to provide "direct and expedited federal judicial review without any need to exhaust state remedies." Omnipoint Communications, Inc. v. Penn Forest Township, 42 F.Supp.2d 493, 506 (M.D.Pa.1999).

As this court noted in a different context, under Indiana law local zoning appeals boards do make "final" municipal policy, Discovery House, Inc. v. Consolidated City of Indianapolis, 43 F.Supp.2d 997, 1001 (N.D.Ind.1999). A petition for certiorari in regard to a zoning decision, rather than being a further administrative step, is analogous to a civil complaint. Board of Zoning Appeals of City of Indianapolis v. Filis, 137 Ind.App. 217, 223, 206 N.E.2d 628, 631 (1965). A zoning appeals board's decision is the final administrative step necessary as a prerequisite to pursuing the judicial remedy available by certiorari. Town Council of New Harmony v. Parker, 726 N.E.2d 1217, 1224 (Ind.2000). It is, therefore, this court's conclusion that the decision of the Porter BZA was "final action . . . by a State or local government or any instrumentality thereof" as meant by § 332(c)(7)(B)(v). Thus, Porter's motion to dismiss this case on the ground that the court lacks subject-matter jurisdiction will be denied.

Cross-motions for Summary Judgment

A summary judgment is mandated by the terms of RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). When considering the motion, the court must construe all of the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 669 (7th Cir.2000). When considering cross-motions for summary judgment, each party receives the benefit of all reasonable inferences that may be drawn from the record when considering the opposing party's motion. See Hendricks-Robinson v.

Page 990

Excel Corp., 154 F.3d 685, 692 (7th Cir. 1998).

With those procedural and substantive standards in mind, the following discussion of the case relies on facts which are not in dispute, either because the parties agree as to that fact, or because one party's attempt to controvert the opposing party's version of the fact is

unsuccessful. Where it is necessary to discuss properly disputed facts in order to understand the parties' positions, the dispute is noted, and the version of the fact as claimed by the person opposing the motion is taken as true. In addition, non-material (i.e., not affecting the outcome) facts may be mentioned for the purpose of providing context. Rather than attempting to list all of the pertinent facts at the outset, the court provides a brief overview. Additional facts are incorporated throughout the discussion as they become necessary.

AT & T provides wireless personal communications service ("PCS") — cellular telephone service, voice paging and data transmission—throughout the United States pursuant to licenses granted by the Federal Communications Commission ("FCC"). The license granted to AT & T allowing it to provide PCS to the region comprised of metropolitan Chicago and northern Indiana requires that AT & T provide PCS to 33% of that market's population within five years.

A PCS network (whether operated by AT & T or one of its competitors) requires antennae to be placed in a honeycomb grid pattern to receive and transmit communications from wireless devices, thus providing overlapping "cells" of coverage for the users of the wireless PCS network. If there are two few antennae (or if their location deviates too much from the grid pattern and they are too far apart), "coverage gaps" of varying severity result in which users of the PCS network experience service interruptions, such as poor-quality connections, mid-call disconnections ("dropped calls"), or an inability to connect to the network at all. The gaps also cause region-wide problems as other antennae in the network become overloaded by handling transmissions that would have been handled by a properly-sited antenna if it existed.

In early 1999 AT & T identified a coverage gap geographically centered around Porter, severe enough that AT & T's PCS customers had "almost non-existent" service indoors and experienced poor-quality connections and dropped calls when placing calls outdoors. AT & T's engineers, using technical criteria that need not be reiterated here, determined that to stop the gap, an antenna at an elevation of 190 feet needed to be located somewhere inside a ring centered near a cloverleaf intersection connecting U.S. Highway 20 with State Highway 49.2 In March 1998, AT & T leased a portion of property located at that intersection, owned by Thomas Tittle, in order to construct a monopole tower on which to place its antenna. On other portions of the property owned by Tittle two communications towers already existed: a 120' lattice tower owned by Cellular One and a 180' lattice tower3 owned by Nextel. Located across Highway 20 from these two towers is a 300' emergency communications antenna operated by the State of Indiana, on a lattice tower. A few hundred yards northeast of the site on other private property is a 120'

Page 991

monopole tower owned by PrimeCo Personal Communications.

The site leased by AT & T was zoned R-3-5 (multifamily residential district). In that zoning designation structures taller than 35' feet are prohibited, necessitating that AT & T apply to Porter's Board of Zoning Appeals for a "use variance" to allow construction of its 190' monopole. Cellular One had obtained a similar variance to construct its tower in 1991, and Nextel had done the same in 1994. PrimeCo obtained permission to build its tower in 1996.4

On June 28, 1999,5 AT & T filed an application for a use variance. The application was accompanied by an "Exhibit Book" which, along with other information, explained AT & T's need for the tower and why an alternative site could not be utilized, described the design and construction of the facility, and affirmed that the tower as constructed would meet all applicable FCC and Federal Aviation Administration ("FAA") rules and regulations.

The Porter BZA first considered AT & T's application for a use variance at a public hearing on July 21, 1999. AT & T was represented by James Kopeny, who reiterated much of the

information contained in AT & T's application, and explained that none of the existing towers could be used as a suitable platform for AT & T's antenna. The tower belonging to Cellular One was too short. Nextel's tower was shorter than optimal but could have been adequately utilized, were it not for the fact that engineering studies commissioned by AT & T had determined that it would not support the weight of AT & T's antenna. PrimeCo's tower did not meet AT & T's radio frequency requirements.

No witnesses appeared to testify-against AT & T's application. BZA members expressed concern about the aesthetics of an additional tower on the site, and were also concerned that if AT & T's variance were granted other PCS providers would also want to place towers on the site in the future leading to increasing unsightliness. Kopeny explained that the AT & T monopole was designed to allow two additional providers to "co-locate" antennae on it in the future, and providers prefer to co-locate because that is cheaper than building a new tower.6 The BZA asked Kopeny to attempt to obtain "letters of intent" from other providers expressing their willingness to co-locate on AT & T's tower in the future, and to investigate whether AT & T could locate its antenna on a nearby water tower as an alternative to constructing a new tower. The BZA tabled discussion of the matter until their next meeting.

At the BZA's next meeting, a public hearing on August 18, 1999, Kopeny restated the points he had made previously, and explained that he had spoken with a

Page 992

staff member at the Northern Indiana Water Company about placing AT & T's antenna on the water tower. The staff member expressed the opinion that the water company had never entered into such an arrangement in the past, and was unlikely to do so in the future. The Water Company officer identified by the staff member as responsible for the decision did not return Kopeny's call, nor return numerous additional calls Kopeny made attempting to speak with the officer.

Tom Crnich, an AT & T radio frequency engineer, testified why the tower, at the height and location proposed, was necessary to remedy the AT & T's coverage gap. Robert Alphonso, of PAL Telecom Group, a structural engineering firm, testified why the existing towers could not support AT & T's antenna, and a copy of the structural engineering report showing the insufficiency of the Nextel tower was provided.

The BZA asked for comment from anyone at the meeting who opposed construction of the tower, but there was none. BZA members again expressed concerns, including their belief that the Town of Porter needed an ordinance regulating further development of wireless communication facilities. At the suggestion of James Mandon, the town planner, the BZA again tabled discussion so that its members could confer with the town council.

The BZA met again on September 15, 1999. BZA member Childress stated that he had presented the BZA's concerns regarding the need for an ordinance addressing wireless communications issues to the town council, but it chose not to address the matter. The BZA then opened the meeting to public comment. Rick Pinkerton stated that he resided on property adjoining the proposed site and that the new tower would interfere with his use of his helicopter. He also expressed the fear that if the tower were damaged, for example by high winds, that it would fall on his property.

AT & T, again represented by Kopeny, stated that the tower was composed of segments designed to collapse upon itself were it ever damaged, and so should not fall onto any adjoining property. In addition, that the tower complied with all FAA requirements but that, if the BZA wished, AT & T would place a warning light on top of the tower. As AT & T notes, the BZA did not ask Pinkerton to explain how the tower could interfere with his helicopter use, given that four towers already existed in the immediate vicinity, nor did it discuss whether

Pinkerton's helicopter use in a residential area conflicted with zoning or FAA regulations. No other witnesses spoke against construction of the tower.

At the conclusion of the meeting, the BZA voted unanimously to deny AT & T's request for a variance. Five months later, at a meeting on February 16, 2000 (after AT & T initiated this suit), the BZA adopted a written statement labeled "Findings of Fact" stating its purported reasons for denying AT & T's request for a use variance. Those findings were:

1. The grant will be injurious to the public health, safety, morals, and general welfare of the community because it will result in locating an obstacle to aviation.

2. The use or value of the area adjacent to the property included in the variance will be affected in a substantially adverse manner because a large tract of residential property is located adjacent to the proposed site. Locating a communications tower as proposed would degrade this property and result in lower valued residential development.

3. The need for the variance does not arise from some condition peculiar to the property. As explained by the petitioner, a relatively large zone was determined

Page 993

which would afford the desired communications coverage. Other locations exist where the tower would not have a negative impact on neighboring property. In addition, the tower could be located on an existing structure such as another communications tower or elevated water storage tank. The fact that the subject property is the least expensive option does not make it peculiar. In addition, the subject property could be developed for other uses unrelated to communications towers within the current zoning classification.

4. The strict application of the terms of the zoning ordinance will not constitute an unusual and unnecessary hardship if applied to the property for which the variance is sought. As mentioned in item 3, this property can be used in accordance with the current zoning without the need for variance. The fact that more investment is necessary to use the property for those permitted uses does not constitute hardship. The petitioner has failed to establish that this site is the only site possible to provide the necessary coverage.

5. The grant does interfere substantially with the comprehensive plan because the subject property detracts from the current and anticipated recreational uses to the north of this site. This petition if granted would also change the nature and quality of adjacent property recommended for residential development.

Starting with this summary of the case, and adding facts as is necessary, the court can address the parties' motions for summary judgment. Because the parties' motions are simply "heads-tails" arguments on the same issues, the court will proceed issue-by-issue, rather than addressing the motions separately.

Violation of § 332(7)(B)(iii) Substantial Evidence Requirement

First, AT & T argues that it is entitled to summary judgment because the BZA's written "Findings of Fact" are a post-hoc justification manufactured by the town planner and an attorney,7 lacking any evidentiary support in the record, thus, the BZA's decision to deny AT & T's request is not supported by substantial evidence in violation of § 332(c)(7)(B)(iii). Porter argues that the court should not even begin to review whether the BZA's decision was supported by substantial evidence because AT & T did not present evidence meeting the necessary criteria to obtain a variance in the first instance, and, in a slight variation on this argument, Porter contends that AT & T's failure to prove it was entitled to a variance shows that the BZA's decision was supported by substantial evidence. Porter argues that it is entitled to summary judgment for either, or both, of the same reasons.

Page 994

In response, AT & T argues that Porter's assertion that AT & T failed to meet its evidentiary burden is an entirely new reason for denying the variance not found in the BZA's written "Findings of Fact" or in answers to AT & T's discovery requests seeking the BZA's reasons for the denial. AT & T therefore believes that the court should not consider the argument and, in any event, that because the BZA's "Findings of Fact" do not specifically state that AT & T failed to meet its burden under state law, the BZA violated the TCA's requirement that a denial be in writing.

The court disagrees. Written statements of denial under the TCA do not have to include a detailed rationale. AT & T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 312-13 (4th Cir.1999); Iowa Wireless Services, L.P. v. City of Moline, Illinois, 29 F.Supp.2d 915, 920-21 (C.D.Ill.1998). In addition, each of the BZA's written findings in this case, for example, that granting the variance would substantially interfere with the town's comprehensive plan, implicitly contains a finding that any evidence to the contrary was not sufficient. Moreover, determining whether AT & T offered evidence to meet the burden necessary under state law to obtain a variance requires only that the court review the same record as is necessary to determine whether the Porter BZA's decision is supported by substantial evidence, and is really only a different was of looking at that question.8 Thus, Porter's argument injects no new element into the case and will not be bypassed.

While the issue as a whole is whether the BZA's decision is supported by substantial evidence, that requirement in § 332(c)(7)(B)(iii) of the TCA simply establishes that courts should apply the traditional standard used for judicial review of agency decisions: if the record as a whole contains such relevant evidence as a reasonable mind would find adequate to support the denial, that decision stands. Aegerter v. City of Delafield, Wisconsin, 174 F.3d 886, 889 (7th Cir.1999); PrimeCo Personal Communications, L.P. v. Village of Fox Lake, 26 F.Supp.2d 1052, 1059 (N.D.Ill.1998); H.R.Conf. No. 104-458, 104th Congress, 2d Sess. 208 (1996) reprinted in 1996 U.S.S.C.A.N. 124. The substantial-evidence requirement does not make a change to the substantive standards to be applied to zoning decisions under state and/or local law. See Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board of Easttown Township, 248 F.3d 101, 106 (3d Cir.2001); Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir.1999); AT & T Wireless Services of Fla., Inc. v. Orange County, 23 F.Supp.2d 1355, 1358-59 (M.D.Fla.1998).

What this means, in practical terms, is that § 332(c)(7)(B)(iii) does not negate any requirement imposed by state and/or local land-use law requiring a party seeking a variance to prove that certain requirements justifying the need for a variance are met. In other words, if a party has that burden under state and or local zoning law, the party cannot make a naked request to construct a telecommunications

Page 995

tower, i.e., appear empty-handed before the zoning authority, and then complain that the zoning authority's simple "no" answer is not supported by substantial evidence. See PrimeCo Personal Communications, L.P., 26 F.Supp.2d at 1063 ("conceivable that a cellular service provider could produce no evidence in support of its application, in which case even unsupported equivocal [constituent] remarks could satisfactorily support a special use denial"); Gearon & Co., Inc. v. Fulton County, Georgia, 5 F.Supp.2d 1351, 1355 (N.D.Ga.1998) ("lack of evidence [on issue which party seeking variance bore burden] constitutes substantial evidence in support of the BZA's denial of the application.")

Under Indiana law, a board of zoning appeals may approve a variance "only upon a determination in writing that:"

(1) the approval will not be injurious to the public health, safety, morals, and general welfare of the community;

(2) the use and value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner;

(3) the need for the variance arises from some condition peculiar to the property involved;

(4) the strict application of the terms of the zoning ordinance will constitute an unnecessary hardship if applied to the property for which the variance is sought; and

(5) the approval does not interfere substantially with the comprehensive plan adopted under the 500 series of this chapter.

Ind.Code § 36-7-4-918.4. The petitioner seeking the variance bears the burden of establishing each one of these statutory prerequisites, and a failure of evidence on one is sufficient for the board of zoning appeals to deny the request. Maxey v. Bd. of Zoning Appeals, 480 N.E.2d 589, 592, 595 (Ind.Ct.App.1985); Metropolitan Development Com'n of Marion Cty. v. Camplin, 153 Ind.App. 622, 288 N.E.2d 569, 572 (1972); Speedway Board of Zoning Appeals v. Popcheff, 179 Ind.App. 399, 401 n. 1, 385 N.E.2d 1179, 1180 n. 1 (1979).9

With this in mind, the court finds that it need only address the second of the BZA's reasons for denying the variance, that "use or value of the area adjacent to the property included in the variance will be affected in a substantially adverse manner," which is the second requirement of § 36-7-4-918.4 of the Indiana Code. AT & T contends that the BZA's finding that construction of the tower would have this impact "result[ing] in lower valued residential development" is not supported by substantial evidence because "not a single person testified to, and there was not a scintilla of evidence regarding, the possible effects that AT & T Wireless's proposed facility would have on the value of neighboring property." AT & T Mem. in Support of its Motion for Summary Judgment at 16. AT & T asserts that the Porter BZA's "unsubstantiated conclusion that communications facilities adversely affect

Page 996

property values because they are, in the BZA members' opinions, aesthetically unappealing simply does not constitute substantial evidence." Id. at 17.

The cases AT & T uses to support this assertion — with one exception noted below at p. 21 n. 11 — have an important factual difference from the present case. In the cases AT & T relies on, the petitioner seeking the variance provided affirmative evidence that property values would not be affected. For example, in Sprint Spectrum, L.P. v. Town of North Stonington, 12 F.Supp.2d 247 (D.Conn.1998), Sprint submitted a study prepared by American Property Consultants ("APC") which concluded that a monopole on the site "would not negatively affect property values." Id. at 253. "Sprint also submitted APC studies" for two other counties "as general evidence that communications towers do not adversely affect property values." Id. As a result, the zoning commission members' denial was not supported by substantial evidence because the members of the zoning commission "improperly ignored the only evidence on property values and because there is no contrary evidence in the record other than mere speculation. . . ." Id. at 254.

In Illinois RSA No. 3, Inc. v. County of Peoria, 963 F.Supp. 732 (C.D.Ill.1997), the court stated "[m]ost importantly [petitioner] Monarch presented information from three certified real estate appraisers who had concluded that cellular transmission towers do not have a negative impact on property values." Id. at 738 (emphasis added). Because the board making the final zoning decision considered no viable contradictory evidence, the court found that the petitioner had satisfied the necessary requirement under the applicable zoning ordinance that there be no adverse impact on other land uses, and the board's denial was not supported by substantial evidence. Id. at 745.

Similarly, in SprintCom Inc. v. Village of Mundelein, 1998 U.S. Dist. Lexis 20397 at *42 (N.D.Ill.Dec. 26, 1998),10 SprintCom provided

the zoning authority "with an appraiser's report which concluded that communication towers in roughly 20 residential districts in Chicagoland had no significant impact on property values." AT & T argues that SprintCom supports the proposition that AT & T did not have to produce appraisals or expert testimony in the present case, because neither was required by the Indiana Code, nor did the Porter BZA require them. However, the SprintCom court noted only that SprintCom's failure to provide a site-specific appraisal was not deficient because SprintCom had no notice that such an appraisal was required. Id. at *42-43. Because SprintCom did provide an appraiser's report, however, the case does not suggest that a complete absence of evidence on the issue of property values passes muster.

In sum, every decision reviewed by this court, with one exception,11 indicates that wireless telecommunications providers pressing successful substantial-evidence claims under the TCA have offered affirmative

Page 997

independent evidence to the zoning authority indicating that the proposed facility will not adversely impact property values. See, e.g., AT & T Wireless PCS, Inc., 172 F.3d at 311 ("AT & T presented a study by a real estate appraiser who concluded that the tower's presence would not adversely impact neighborhood real estate prices"); Cellular Telephone Co., 166 F.3d at 492, 492 ("AT & T" presented evidence suggesting that the cellsites would not affect the character of the neighborhood or the value of the real estate value of nearby property, making "generalized concerns about a potential decrease in property values, especially in light of AT & T's contradictory expert testimony" not adequate to support denial); PrimeCo Personal Communications, L.P., 26 F.Supp.2d at 1056 (independent real estate appraiser appearing for wireless provider testified that "in general, communications towers do not have an adverse effect on surrounding property values, and read a report to that effect"); BellSouth Mobility, Inc. v. Gwinnett County, Ga., 944 F.Supp. 923, 928 (N.D.Ga.1996) (provider submitted "expert appraiser's reports indicating the placement of monopoles has not, on other occasions, adversely affected residential property values.")

AT & T's argument that the Porter BZA's conclusion that the aesthetics of the tower would negatively impact property values is not supported by substantial evidence attempts to sidestep AT & T's own failure to meet its burden under Ind.Code § 36-7-4-918.4(2), by providing some evidence that the value and future development of adjacent property would not be adversely affected. AT & T argues that it did offer evidence on this issue, but the "evidence" it cites in its motion for summary judgment (and in opposition to Porter's motion) is essentially nothing more than its own aesthetic opinion.

In requesting summary judgment, AT & T argues that its application for the variance "provided a detailed explanation of AT & T Wireless's unambiguous compliance with each of the statutory standards for a use variance," Statement of Facts ¶ 24 (citing Kopeny affidavit as supporting evidence).12 Kopeny states:

The [AT & T variance] application established that the facility would not materially affect adjacent property. The facility's monopole design (which is only 8' wide at its base) would not impair the supply of light or air to neighboring property which is currently used for commercial telecommunication purposes. Relying on these facts, the application stated that the AT & T Wireless installation would have little aesthetic impact on surrounding properties and would not interfere with any other forms of communication.

Kopeny affidavit ¶ 18.

Unlike the cases cited above, neither AT & T's variance application, nor any evidence submitted at the BZA hearings, contained any type of expert testimony concerning the aesthetic impact of the tower and possible effect on adjacent property values. Instead, AT & T's application (in its attached "Exhibit Book") stated:

Property Values

Due to the fact that AT & T has been sensitive in selecting a site that will minimize the impact on the surrounding property, its facility will be compatible with the existing environment. The proposed facility consists of a monopole structure that has very little impact on the surrounding area. This structure is similar to a light standard. The proposed facility will consist of a monopole

Page 998

antenna structure not to exceed 190' and an accompanying unstaffed electronic equipment shelter. AT & T will lease a 50' × 50' parcel of land. With such a small footprint, this facility will have little impact on the use and enjoyment of property in the immediate vicinity for the purposes already permitted, nor will there be an adverse effect on property values within the neighborhood. To the contrary, enhanced wireless communications will have a positive influence on the development of this area.

Part 5 of variance application, ex. 1 to Kopeny affidavit. In its brief in support of its motion for summary judgment, AT & T admits that the "only evidence in the record regarding property values was AT & T Wireless's Exhibit Book which stated that `[d]ue to the minimal size of the leased parcel and the nature of the surrounding uses, there will be little impact on the character of the locality, with no adverse effect on existing or future development of the area.'" Brief at 17.

The best summary of why AT & T believes this statement of its opinion constitutes "evidence" why the tower would not adversely impact the landscape and property values is found in its brief opposing Porter's motion: "Three communication towers already exist at the proposed location. . . . The evidence presented by AT & T Wireless and common sense dictate that the addition of AT & T Wireless's tower at the proposed location would not substantially lower neighboring property values." AT & T Mem. in Opp. to Porter's Motion for Summary Judgment at 13. AT & T reiterates this assertion in its reply brief in support of its own motion: "It is counterintuitive to assume that an additional communications facility would adversely affect property that is used solely for such purposes." AT & T Reply Mem. at 11. In short, AT & T's evidence boils down to its own supposition about property values, based on its own "common-sense" aesthetic judgment that four towers look no worse than three.13

In terms of common sense, the court doubts that anyone would disagree that twenty towers in one location would have an adverse impact on property values that three would not. Somewhere on that continuum a line must be drawn, and the court cannot say that the BZA's decision to draw the line after three was not supported by substantial evidence where AT & T offered no evidence other than its own, surely-biased, aesthetic opinion.14 Cf. Aegerter, 174 F.3d at 890 (upholding aesthetic judgment of city where provider argued that "marginal effects of the tower were minimal," but city did not look at marginal effects, instead taking view that "expansion of commercial use in the area would be unsightly and inconsistent with its R-1 residential zoning.") Under the TCA, aesthetic judgments are still the province of state and local zoning authorities. Aegerter, 174 F.3d at 891 ("Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and we note that aesthetic

Page 999

harmony is a prominent goal underlying almost every such code"); Town of Amherst, 173 F.3d at 15 (wireless provider "may think that even from an aesthetic standpoint, its solution is the best. But subject to an outer limit, such choices are just what Congress has reserved to the town.") Because AT & T offered no independent evidence on aesthetics and property values to contradict the BZA's views on those matters, the BZA's decision is supported by substantial evidence, entitling Porter to summary judgment on that issue.15

Violation of § 332(7)(B)(i)(I) Unreasonable Discrimination Prohibition

AT & T argues that it is entitled to summary judgment determining that Porter violated § 332(c)(7)(B)(I)(i), which provides that a zoning authority's regulation of the placement of wireless communication facilities "shall not unreasonably discriminate among providers of functionally equivalent services." AT & T asserts that there is no material difference16 between its tower and those already on and near the site, and therefore the BZA's denial of AT & T's request, based on nothing more than the members' feelings about the aesthetics of an additional tower, is unreasonable discrimination as a matter of law. Explaining further, AT & T argues that the undisputed evidence shows that Porter now has an unofficial policy requiring any new wireless facility to be co-located17 on an existing tower, and because that policy

Page 1000

was not applied to the providers who already built towers in Porter, the policy is a form of unreasonable discrimination. Porter disputes that it has adopted such a policy, and contends that it is entitled to summary judgment in any event because it denied AT & T a variance based on valid zoning criteria, not unreasonable discrimination.

The key here is the word "unreasonable:" state and local zoning authorities can discriminate among providers as long as that discrimination is not "unreasonable." AT & T Wireless PCS, Inc. v. City Council of Virginia Beach, 155 F.3d 423, 427 (4th Cir.1998); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 638 (2d Cir.1999). The legislative history to the TCA indicates that its drafters "intend[ed] that the phrase `unreasonably discriminate among providers of functionally equivalent services' will provide localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." H.R.Conf.Rep. No. 104-458, 104th Cong., 2d Sess. 208 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 221-222.

As a result, a decision based on traditional zoning criteria, such as "avoiding aesthetic blight," is not unreasonable. AT & T Wireless PCS, Inc., 155 F.3d at 427. As explained above in the discussion whether the Porter BZA's decision was supported by substantial evidence, AT & T failed to provide affirmative independent evidence that the aesthetics of an additional tower on the site in question would not have an adverse effect on the surrounding property. Therefore, any requirement Porter may have applied to AT & T requiring it to co-locate its antenna on an existing tower is not a form of "unreasonable" discrimination, and Porter is entitled to summary judgment.

Violation of § 332(7)(B)(i)(II) Bar on Prohibition of Wireless Services

AT & T argues that it is entitled to a summary judgment determining that Porter violated § 332(c)(7)(B)(i)(II), which provides that a zoning authority's regulation of the placement of wireless communication facilities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." Because this subsection of the TCA speaks to a ban on the provision of wireless services, and not on the wireless services of a particular provider, one denial of a particular provider's application will not, generally speaking, violate the provision. APT Pittsburgh Limited Partnership v. Penn Township Butler County of Pennsylvania, 196 F.3d 469, 478-79 (3rd Cir.1999); Omnipoint Communications, Inc., 42 F.Supp.2d at 499 n. 6. Thus, Porter contends that it is entitled to summary judgment because it is undisputed that three different wireless providers already have facilities located in town, and the BZA has indicated a willingness for AT & T (or any other provider) to locate additional facilities in town, so long as they are co-located on an existing facility or otherwise constructed in an aesthetically unobtrusive manner.

As to the latter point, AT & T disagrees that there is any evidence indicating that the BZA will allow additional wireless facilities and contends that the undisputed evidence shows the contrary, that is, that the BZA will not allow any additional facilities to be constructed.18 In response to both of Porter's points, despite the fact that "courts have uniformly held that § 322(c)(7)(B)(i)(II) is violated only where the local regulatory agency creates a general

Page 1001

ban against all personal wireless communication services," Omnipoint Communications, Inc. v. City of Scranton, 36 F.Supp.2d 222, 232 (M.D.Pa.1999), AT & T argues that an unpublished decision from the District of Connecticut, Sprint Spectrum L.P. v. Town of Farmington, 1997 WL 631104 (D.Conn. Oct.6, 1997), held that a general moratorium on the construction of new wireless facilities, where five wireless facilities already existed, violated the TCA.

Although the holding of Sprint Spectrum is as AT & T states, in that case the court considered an explicit 270-day moratorium on the filing of any applications to construct new telecommunications facilities and in one sentence held: "the moratorium unreasonably delays consideration of Sprint's implementation requests and effectively prohibits wireless telecommunication services, in violation of §§ 332(c)(7)(B)(ii) and (B)(i)(I).19" Id. at *6. The case contains no analysis or discussion of subsection (B)(I)(ii), and no explanation how a decision to stop construction where five wireless facilities already existed could have the effect of prohibiting personal wireless services.

Sprint Spectrum is an anomaly and, lacking any persuasive reasoning, will not be followed. What § 332(c)(7)(B)(i)(II) appears to mean is that there cannot be a de facto ban on personal wireless services altogether, not that "every municipality must have towers wherever anyone wants to put them." Aegerter, 174 F.3d at 891. Because the undisputed evidence establishes that there is no gap in the provision of wireless services in the Porter area in question, only a gap in AT & T's ability to provide its service to its customers,20 no violation of § 332(c)(7)(B)(i)(II) can be proved. Porter is entitled to summary judgment on this issue.

For the foregoing reasons, Porter's motion to strike (docket # 61) is DENIED; Porter's motion to dismiss for lack of jurisdiction (docket # 38) is DENIED; Porter's motion to dismiss for failure to state a claim (docket # 46) is DENIED as moot in light of the court's other rulings; AT & T's motion for summary judgment (docket# 49) is DENIED; and Porter's motion for summary judgment (docket # 43) is GRANTED. The clerk shall enter a final judgment stating that AT & T is entitled to no relief on its complaint.

SO ORDERED.

---------------

Notes:

1. This argument contains an inherent contradiction. Porter is arguing that the certiorari process provided in Ind.Code § 36-7-4-1003 is an unexhausted "administrative" remedy, but § 36-7-4-1003 in fact is the judicial remedy available under Indiana law only after exhausting prior administrative procedures. Town Council of New Harmony v. Parker, 726 N.E.2d 1217, 1224 (Ind.2000).

2. The parties dispute the precise diameter of the ring and the closeness of its center to the U.S. 20/Route 49 intersection. That dispute is not material to the court's resolution of this case.

3. To the court, a monopole tower resembles an enormous lamppost, while a lattice tower looks like it was constructed from a giant Erector (tm) set.

4. The materials submitted by AT & T indicate that the Porter BZA granted a "special use permit" to PrimeCo to build a 150' monopole. It is not clear how, or whether, a special use permit differs from a use variance. Neither have the parties explained why PrimeCo's tower was built

30' shorter than as approved, nor whether that height difference had any impact on AT & T's ability to co-locate on the tower.

5. The application was filed on AT & T's behalf by Site Acquisition Consultants, a firm retained by AT & T to provide services in connection with selecting land and obtaining permission to construct PCS facilities thereon. James Kopeny, who represented AT & T throughout the process, is employed by that firm.

6. However, at least one published decision indicates that the wireless provider claimed that the "competitive nature" of its relationship with another provider precluded co-location on that provider's tower. Iowa Wireless Services, L.P. v. City of Moline, Ill., 29 F.Supp.2d 915, 918 (C.D.Ill.1998).

7. Although AT & T points out that one court has held that such post hoc justification does not comply with the TCA's writing requirement, Virginia Metronet v. Bd. of Supervisors of James City County, 984 F.Supp. 966, 972-73 (E.D.Va.1998), AT & T does not press that argument. AT & T Mem. in Opp. to Porter's Motion for Summary Judgment at 10 & n. 4. As at least one other court has noted, requiring local zoning authorities to issue contemporaneous written findings would create an "administrative morass" which "might well . . . invite Tenth Amendment scrutiny." AT & T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 313 (4th Cir.1999). Another court rejecting such an argument observed that it is common for governmental entities to adopt writings drafted by staff and/or attorneys. Iowa Wireless Services, L.P. v. City of Moline, Illinois, 29 F.Supp.2d 915, 920-21 (C.D.Ill.1998). Whether or not the written findings in the present case are supported by substantial evidence, they are consistent with the contemporaneously-stated concerns of the Porter BZA members, and were adopted by the BZA.

8. In fact, when a party who bears the burden of proof on an issue fails to offer evidence to prove that issue, it is a "pointless inquiry" for a court to attempt to apply a substantial evidence standard to the decision made because "it would be the absence of evidence that would make the . . . conclusion supportable." N.L.R.B. v. Quinnipiac College, 256 F.3d 68, 73 (2d Cir.2001); see also Willingham v. Secretary of Health, Ed. and Welfare, 377 F.Supp. 1254, 1257 (S.D.Fla.1974) ("difficulty with agency determinations which leave the issue in such a posture is that they invite the parties upon review to tilt at windmills, each negativing the quality of the other's proof, after having neglected its own.")

9. The court notes that, contrary to the mandate of § 332(c)(7)(B)(iii) of the TCA, the cited Indiana cases reason that because the petitioner seeking a variance has the burden of meeting the statutory prerequisites, zoning decisions need not be supported by substantial evidence. See also Metropolitan Board of Zoning Appeals of Marion County v. Zaphiriou, 176 Ind.App. 422, 376 N.E.2d 110 (1978). Although the TCA obviously changes this with respect to zoning decisions impacting telecommunication facilities, it nevertheless remains true that if a petitioner offers no evidence in support a statutory requirement for a variance, then the zoning authority's denial passes the substantial evidence test. Gearon & Co., Inc., 5 F.Supp.2d at 1355.

10. The decision AT & T cites is a Magistrate Judge's Report & Recommendation. A later order in the case by the district judge also references the expert appraisal. Sprintcom, Inc. v. Village of Mundelein, 1999 WL 652032 at *2 (N.D.Ill.1999) (Sprintcom "submitted a real property valuation study prepared by . . . a certified general appraiser, which stated that corresponding property values would not be adversely impacted . . . .")

11. One case cited by AT & T, Iowa Wireless Services, L.P. v. City of Moline, Illinois, 29 F.Supp.2d 915 (C.D.Ill.1998), contains no discussion whether the petitioner seeking the variance provided affirmative evidence or whether that issue even was raised in the case. The court noted, however, that in some circumstances citizen concerns concerning

aesthetic or economic detriments can constitute substantial evidence. Id. at 922.

12. Kopeny's affidavit is Ex. A to AT & T's Statement of Material Facts. AT & T cites paragraph 20 of Kopeny's affidavit, but it appears that this is a clerical error and that paragraph 18 was intended.

13. AT & T asserts that Porter's town planner, James Mandon, admitted that the site in question probably could not be used for anything else because of the towers already there. This is not the same as concluding that an additional tower will not have a detrimental impact on surrounding properties.

14. It should also be noted that, besides being taller than the existing wireless telecommunications towers on the site (albeit shorter than the State of Indiana's tower), the existing towers are lattice-type, which some providers have argued are less visually intrusive than the monopole type that AT & T proposes to construct. See Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51, 62 (1st Cir. 2001).

15. Although failure to meet only one of the criteria set out in Ind.Code § 36-7-4-918.4 is sufficient to deny a variance, the court also notes that, while AT & T contends that the BZA's finding that the variance would substantially interfere with Porter's comprehensive plan was not supported by substantial evidence, AT & T also failed to present any evidence on that issue to the BZA.

16. To make this point, AT & T relies mainly on deposition testimony of BZA members that saw no "functional difference" between the towers. As noted above however, p. 25 n. 14, the proposed AT & T tower is both taller and of a different type than the existing towers on the site.

17. The co-location issue in this case provides food for thought. The evidence indicates that the Porter BZA approved the PrimeCo tower in 1996 based on PrimeCo's assurances that future providers needing an antenna in the vicinity would be able, and find it desirable, to co-locate on its tower. Thus, the BZA expressed surprise at AT & T's claim that it could not co-locate on PrimeCo's (or one of the other providers') tower, and understandable skepticism at AT & T's claim that future providers would be able to co-locate on its tower. The BZA asked AT & T to explore whether one of the providers would agree to remove its tower and co-locate on the new AT & T tower. (It appears that AT & T may not have done so: Kopeny explained that AT & T had no way of forcing a private party to do so.)

The court notes that the minutes of the April 17, 1996, Porter BZA meeting (Ex. D to AT & T's Statement of Material Facts) regarding approval of PrimeCo's tower indicate that PrimeCo's representative, Matt Barnard, was specifically asked whether additional equipment could be located on the tower PrimeCo wished to build. The minutes summarize Barnard's answer as "paging companies . . . as well as another company, like ATT, who are on approximately the same frequency as PrimeCo" (emphasis added.) The court also notes that the special use permit granted to PrimeCo to construct the tower contained a number of conditions, including that the "special use may be terminated . . . upon a finding at a public hearing, with notice to the property owner, that the . . . conditions of approval . . . have not been complied with." Id.

The court also notes that § 36-7-4-918.4 of the Indiana Code states that a board of zoning appeals "may impose reasonable conditions" on the grant of a variance. Without expressing any view on its legality, the court wonders whether a condition that, should its tower prove unsuitable for co-location by other wireless providers in the future, AT & T would dismantle the tower and co-locate on a new tower, would be acceptable to AT & T and serve Porter's long-term zoning objectives.

18. This argument is contradicted somewhat by AT & T's assertion discussed in the previous section that Porter's de facto policy is to require co-location on existing structures.

19. This appears to be a typographical error where (B)(I)(ii) was meant.

20. There is no evidence in the record indicating whether AT & T customers in the area can receive acceptable wireless service by "roaming" to other providers.

---------------