UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| OMNIPOINT HOLDINGS, INC.,<br><br>Plaintiff,<br>v.<br><br>THE CITY OF CRANSTON, THE ZONING BOARD OF REVIEW OF THE CITY OF CRANSTON and JOY MONTANARO, EDWARD DIMUCCIO, CURTIS PONDER, FRANK CORSO III, and DONALD CURRAN in their capacities as members of the City of Cranston Zoning Board of Review<br><br>Defendants. | Civil Action No. 06-531ML |

**STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT**
**OF PLAINTIFF, OMNIPOINT HOLDINGS, INC.**

The plaintiff Omnipoint Holdings, Inc. ("Omnipoint") submits the following statement of undisputed facts in support of its motion for summary judgment.

## A. Omnipoint's PCS Technology

1. Omnipoint is licensed by the Federal Communications Commission ("FCC") to provide Personal Communications Services ("PCS") in the State of Rhode Island, including the City of Cranston. Exhibit 7 – Affidavit of Gerald Marquis, ¶ 3.

2. PCS digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. This technology allows Omnipoint to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data, paging and imaging

capabilities, as well as voice mail, call forwarding and call waiting. Exhibit 8 – Affidavit of Elijah Luutu ("Luutu Aff."), ¶ 7.

3. Mobile devices using PCS technology transmit a radio signal to antennas mounted on a tower, pole, building, or other structure. Exh. 8 - Luutu Aff., ¶ 8.

4. The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station. Id.

5. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to the Base Station Controller, subsequently routing the calls throughout the world. Id.

**B. Omnipoint's Network Needs**

6. The operation of Omnipoint's PCS depends upon a network of wireless communications facilities. Exh. 8 - Luutu Aff., ¶ 9.

7. Because PCS uses a lower signal and a much higher frequency than traditional cellular technology, the range between the PCS mobile telephone and the antennas is limited. Id.

8. Given Omnipoint's FCC-designated frequency, its usual and optimum range for radio frequency propagation is one and a half miles, with yields lessened by building density, terrain and tree cover. Id.

9. To provide effective, reliable and uninterrupted service to PCS users in their cars, home and office, without interruption or lack of access, coverage must overlap in a grid pattern resembling a honeycomb. Exh. 8 - Luutu Aff., ¶ 10.

10. In the event that Omnipoint is unable to construct a wireless communications facility within a specific geographic area, so that each site's coverage

overlaps with an adjacent facility, Omnipoint will not be able to provide service consistent with its obligations under its FCC license to the consumers within that area. Exh. 8 - Luutu Aff., ¶ 11.

11. Those consumers will experience an abrupt and complete loss of signal. Id.

12. To determine where telecommunications facilities need to be located for the provision of reliable coverage in any area, Omnipoint's radio frequency engineers use industry-standard computer modeling software programs. In its simplest form, the software programs employed by Omnipoint generate propagation maps, which identify by color coding existing coverage and coverage gaps in a given area. Anyone reviewing Omnipoint's propagation maps can plainly see where coverage gaps exist as those gap areas are indicated in white on Exhibit 2. Exh. 8 - Luutu Aff., ¶ 12a.

**C. There is a Coverage Gap in Cranston**

13. Omnipoint determined, based upon its review of its wireless coverage in the southwest section of Cranston, that it had a coverage gap in that section of the city. Exh. 8 - Luutu Aff., ¶ 15.

14. Specifically, its radio frequency propagation maps indicated that it lacked coverage in the area bordered by Hope Road, Phenix Avenue and Burlingame Road. Id.

15. These roadways provide a direct path of travel from Cranston to West Warwick and Coventry. Id.

16. The gap extends to adjacent roads in the surrounding neighborhoods and affects users attempting to access Omnipoint's PCS network within the affected area. Id.

**D. Omnipoint Searches for a Site to Remedy its Coverage Gap**

17. Omnipoint confirmed the gap disclosed on its computer-generated propagation maps with field tests and then sought to determine where to locate a wireless facility in order to remedy its coverage gap. Exh. 8 - Luutu Aff., ¶¶ 13-15.

18. Its field testing included drive testing, which entails measuring radio signals in the vicinity of a possible site for a facility. Exh. 8 - Luutu Aff., ¶ 12b.

19. In addition, Omnipoint observed local topography and nearby structures to assess potential sites for a wireless communications facility. Consistent with its standard practice, it also reviewed the location and design of its existing facilities in the area to assess the potential interaction of possible sites within Omnipoint's PCS network. Exh. 8 - Luutu Aff., ¶¶ 17-18.

20. Omnipoint performed its field tests and analyses in the subject coverage gap area. Exh. 8 - Luutu Aff., ¶¶ 13-15.

21. Based on the results, it determined that it needed to locate a wireless facility in the vicinity of 1753 Phenix Avenue (the "Property") to remedy the gap along the direct travel routes between Cranston and West Warwick and Coventry. While Omnipoint had wireless facilities nearby, none of them provided coverage in the vicinity of the Property. Exh. 8 - Luutu Aff., ¶ 20.

22. Taking into account the limitation of its radio frequency propagation imposed by Omnipoint's FCC-designated frequency, Omnipoint site acquisition specialists searched for and identified other potential sites within one and a half miles of the Property. Exhibit 9 – Affidavit of Shayana Cordova ("Cordova Aff."), ¶¶ 4, 9-10.

23. Omnipoint ruled out one potential site, the Cranston Fire Department Museum, after determining that additional facilities at that site would be redundant to existing coverage without remedying the coverage gap. Exh. 8 - Luutu Aff., ¶ 19.

24. Another potential site was ruled out because it was unavailable. Specifically, Omnipoint engaged in a series of protracted negotiations with the owners of the Cranston Country Club ("Club" or "Country Club") about locating wireless facilities at the Club to remedy its coverage gap. Exh. 9 - Cordova Aff., ¶¶ 10-16.

25. First, it sought rights to access the Club's property so that it could install antennas on an existing utility pole. Exh. 9 - Cordova Aff., ¶¶ 10-11.

26. Fearing damage to the golf course fairways, one of the Club's owners rejected that proposal. Exh. 9 - Cordova Aff., ¶ 11.

27. Omnipoint then proposed leasing land from the Club and installing a monopole on the Club's property. Exh. 9 - Cordova Aff., ¶ 13.

28. The Club's owners disagreed about how to allocate lease payments. Exh. 9 - Cordova Aff., ¶¶ 14-15.

29. In an attempt to resolve this dispute, Omnipoint offered $25,000 to whichever owner would accede to the other's position. Exh. 9 - Cordova Aff., ¶ 15.

30. After several months, the monopole proposal also failed as none of the owners would accede. Exh. 9 - Cordova Aff., ¶¶ 15-16.

31. Omnipoint determined that other than the Country Club, the only other potential site that offered sufficient land on which to build a monopole structure was the Property. Exh. 9 - Cordova Aff., ¶¶ 17-19; Exh. 8 – Luutu Aff., ¶ 21.

32. As a result of Omnipoint's drive testing data and analysis of radio frequency propagation maps, as well as a review of existing and potential alternative sites, it concluded that the only feasible alternative to rectify Omnipoint's network coverage gap in the vicinity of the Property would be to construct a ninety foot (90') monopole at the Property and to install three panel antennas at a height of eighty-seven (87) feet center line of its antennas (the "Proposed Monopole"). Exh. 8 – Luutu Aff., ¶ 20.

33. No other existing facility or location (other than the Country Club, which was unavailable) would remedy Omnipoint's coverage gap. Exh. 8 – Luutu Aff., ¶ 21.

**E. Omnipoint Applies for Zoning Relief**

34. The Proposed Monopole meets Cranston's zoning setback requirements on all sides of the Property but its southern property line. Exhibit 10 – Affidavit of Ricardo M. Sousa ("Sousa Aff."), ¶ 7.

35. Therefore, on or about September 21, 2005, Omnipoint, as co-applicant with the owner of the Property, applied to the Zoning Board of Review for the City of Cranston ("Zoning Board") for a dimensional use variance from the City of Cranston's setback requirements. Exh. 10 – Sousa Aff., ¶ 8.

36. Omnipoint also applied for a special use permit. Id.

37. Prior to public hearing on its requested relief, Omnipoint attended a public hearing before the City of Cranston Planning Commission, which, under the terms of Section 30-29 of Cranston's zoning ordinance, may provide a non-binding opinion to the Board with respect to special use permit applications. Exh. 10 – Sousa Aff., ¶ 9.

38. In its written decision, the Planning Commission recommended that the Zoning Board deny the zoning relief requested by Omnipoint, on the grounds that "the applicant has not demonstrated that existing nearby facilities cannot accommodate the service need." Exh. 10 – Sousa Aff., ¶ 10.

39. In the months following this recommendation, Omnipoint provided to the Planning Commission undisputed evidence that it could not provide the service required by its FCC license from "existing nearby facilities" and, moreover, that no alternative location existed as a potential site for its proposed property. Exh. 10 – Sousa Aff., ¶¶ 11-12.

40. Specifically, it presented evidence that additional facilities at the Cranston Fire Department Musuem would result in redundant coverage without remedying the coverage gap. It also presented evidence regarding its efforts to locate antennas on an existing utility pole or a monopole at the Country Club. Exh. 10 – Sousa Aff., ¶ 12.

41. Thereafter, the Zoning Board held two public meetings on Omnipoint's applications for the variance and special use permit. Exh. 10 – Sousa Aff., ¶ 13.

42. At the public hearings, Omnipoint submitted evidence regarding Omnipoint's proposed antenna installation, its decision to use a flagpole style monopole to minimize complaints about the aesthetic aspects of the site, its existing and proposed coverage from the installation and its efforts to find alternative sites in the area. Id.

43. The Zoning Board denied Omnipoint's applications for a dimensional variance and special use permit. Id.

**F. The Zoning Board Attempts to Justify its Denials**

44. The Zoning Board has offered an affidavit of a radio frequency engineer, David Maxson, in support of its defense in the instant case. In his affidavit, Mr. Maxson states that if Omnipoint reduced the height of its proposed monopole from ninety feet (90') to seventy-five feet (75'), it would comply with Cranston's Zoning Ordinance. Exh. 8 – Luutu Aff., ¶ 23; Exhibit 11 – Affidavit of David P. Maxson ("Maxson Aff."), ¶ 26.

45. While this may be true, a shorter tower at the Property might meet certain of Cranston's zoning height requirements, it would not provide coverage adequate to remedy the coverage gap near the Property. Exh. 8 – Luutu Aff., ¶ 23.

46. Further Mr. Maxson correctly states that the proposed monopole would not satisfy Omnipoint's "self-imposed criteria for 'reliable service'" as its signal will not reach adjacent aras in Cranston. Exh. 8 – Luutu Aff., ¶ 24; Exh. 11 – Maxson Aff. ¶ 28.

47. Indeed, given the limited range of radio frequency propagation, there is no single facility capable of remedying every existing coverage gap in Cranston. Exh. 8 – Luutu Aff., ¶ 24.

48. Not even the multiple sites that exist in Cranston provide complete, seamless coverage. Exh. 8 – Luutu Aff., ¶ 24.

49. Mr. Maxson suggests, without any substantiation, that if Omnipoint "seeks to grow 'seamless' in-building service in Cranston, then it is most productive to develop a more densely laid out network of smaller, lower-height facilities." Exh. 8 – Luutu Aff., ¶ 25; Exh. 11 – Maxson Aff. ¶ 33.

50. Even assuming this is true, a more dense design of wireless facilities would create additional zoning issues as, to reach its customers, more facilities would be required, many of them in residential areas. Id.

Respectfully submitted,

OMNIPOINT HOLDINGS, INC.

By its attorneys,

/s/ Paul Cantor
Paul Cantor, Esq.
RI Attorney #3177
321 South Main Street, #302
Providence, RI 02903
Telephone: (401) 351-8200
Fax Number: (401) 351-9032

/s/ William A. Worth
William A. Worth, Esq.
Kristin M. Knuuttila, Esq.
PRINCE, LOBEL, GLOVSKY & TYE LLP
100 Cambridge Street, Suite 2200.
Boston, MA 02114
Telephone: (617) 456-8000
Fax Number: (617) 456-8100

Date: November 29, 2007

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 29, 2007.

/s/ William A. Worth