UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| OMNIPOINT HOLDINGS, INC.,<br><br>Plaintiff,<br>v.<br><br>THE CITY OF CRANSTON, THE ZONING BOARD OF REVIEW OF THE CITY OF CRANSTON and JOY MONTANARO, EDWARD DIMUCCIO, CURTIS PONDER, FRANK CORSO III, and DONALD CURRAN in their capacities as members of the City of Cranston Zoning Board of Review<br><br>Defendants. | Civil Action No. 06-531ML |

AFFIDAVIT OF ELIJAH LUUTU

Now comes Elijah Luutu and being duly sworn, does hereby depose and say as follows:

1. I submit this Affidavit, based upon personal knowledge, in support of the Motion for Summary Judgment filed by Omnipoint Holdings, Inc. ("Omnipoint") in the above-captioned matter.

2. I am a consultant to T-Mobile, USA, Inc., which is the parent corporation of Omnipoint.

3. Specifically, I am a radio frequency engineer, and, as such, am responsible for radio frequency engineering related to the design and implementation of Omnipoint's Personal Communications Systems ("PCS") network in Rhode Island.

4. A true and accurate copy of my qualifications are attached to Omnipoint's Statement of Undisputed Facts as Exhibit 1.

5. I served as Omnipoint's radio frequency engineer with respect to the proposed wireless communications facility at 1753 Phenix Avenue in Cranston, Rhode Island (the "Property"); therefore, I have personal knowledge of the proposed wireless communications facility at that Property.

6. In preparing this Affidavit, I relied on my personal knowledge of the Property and with Omnipoint's PCS network, as well as my review of certain of Omnipoint's records with respect to the Property and its wireless telecommunications facilities in Cranston.

7. PCS digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. This technology allows Omnipoint to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data, paging and imaging capabilities, as well as voice mail, call forwarding and call waiting.

8. Mobile devices using PCS technology transmit a radio signal to antennas mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to the Base Station Controller, subsequently routing the calls throughout the world.

9. The operation of Omnipoint's PCS depends upon a network of wireless communications facilities. Because PCS uses a lower signal and a much higher frequency than traditional cellular technology, the range between the PCS mobile telephones and the antennas is limited. Given Omnipoint's FCC-designated frequency, its usual and optimum range for radio frequency propagation is one and and half miles, with yields lessened by building density, terrain and tree cover.

10. To provide effective, reliable and uninterrupted service to PCS users in their cars, home and office, without interruption or lack of access, coverage must overlap in a grid pattern resembling a honeycomb.

11. In the event that Omnipoint is unable to construct a wireless communications facility within a specific geographic area, so that each site's coverage overlaps with an adjacent facility, Omnipoint will not be able to provide service consistent with its obligations under its FCC license to the consumers within that area. Those consumers will experience an abrupt and complete loss of signal.

12. To determine where telecommunications facilities need to be located for the provision of reliable coverage in any area, Omnipoint's radio frequency engineers use industry-standard computer modelling software programs and conduct drive testing.

a. The software programs generate propagation maps, which identify existing coverage and coverage gaps in a given area. For example, Exhibit 2 to Omnipoint's Statement of Undisputed Facts is a true and accurate copy of a propagation map of existing coverage (without the proposed installation at the Property) in parts of Rhode Island including Cranston. The green (or dark if the map is in black and white) areas depict covered areas. The white (or light) areas depict areas where coverage gaps exist. The proposed installation at the Property is identified as PR646B in one of the white areas.

b. Drive testing entails measuring radio signals in the vicinity of a possible site for a facility. Attached as Exhibit 3 to Omnipoint's Statement of Undisputed Facts is a true and accurate copy of drive test data coverage in portions of Cranston, West

Warwick, Covertry and Scituate, Rhode Island that are in the vicinity of the Property.

In addition, Omnipoint observes local topography and nearby structures to assess potential sites for a wireless communications facility. It reviews the location and design of its facilities in the area to assess a proposed site's potential interaction with its PCS network.

13. As part of my duties as the radio frequency engineer for the proposed wireless facility at the Property, I conducted drive testing in the vicinity of the Property.

14. I also reviewed radio frequency propagation maps with respect to the area bordered by Hope Road, Phenix Avenue and Burlingame Road in Cranston. Exhibit 4 to Omnipoint's Statement of Undisputed Facts is a true and accurate copy of the radio frequency propagation map which predicts coverage in the vicinity of the Property if antennas are placed at a height of approximately ninety feet (90') above elevation.

15. Based upon my review of the propagation maps and my observation of traffic in the area, I determined that there is a significant gap in Omnipoint's radio frequency coverage in the vicinity of a highly traveled area of Cranston, bordered by Hope Road, Phenix Avenue and Burlingame Road. These roadways provide a direct path of travel from Cranston to West Warwick and Coventry. The gap extends to adjacent roads in the surrounding neighborhoods and affects users attempting to access Omnipoint's PCS network within the affected area, whether those users are in their vehicles or homes.

16. To rectify this significant gap in its coverage, I concluded that Omnipoint needed to locate a wireless facility in the immediate vicinity of the Property.

17. I then reviewed Omnipoint's business records to determine whether nearby, existing towers might be utilized to address the coverage gap.

18. I determined, through my review of Omnipoint's business records, that Omnipoint has antennas on the existing tower at 900 Phenix Avenue, east of the Property in the vicinity of I-295. Omnipoint also has antennas on Cingular's tower northeast I-295 near State Highway 51. Omnipoint also has antennas on an existing lattice tower approximately one and one half miles northwest of the Property. I reviewed the propagation maps that included Omnipoint's existing antennas and the coverage gaps that exist. Based on my review of those propagation maps, I determined that the existing towers do not fill Omnipoint's gap in coverage in the vicinity of the Property; therefore, they cannot be used as alternatives to the proposed facility at the Property.

19. Omnipoint's site acquistion personnel identified several other potential sites where Omnipoint did not already have existing wireless facilities. At their request, I visited several other potential sites to determine whether a wireless telecommunications facility that would remedy the significant gap can be installed at a site other than the Property. For example, I visited the Fire Department Museum in Cranston, which is approximately seven tenths of a mile northwest of the Property. I determined that a radiophone at that site would provide redundant coverage to already eixsting Omnipoint coverage without remedying the coverage gap. I was informed that another potential site, the Cranston Country Club, was not available to Omnipoint.

20. As a result of my drive testing data and analysis of radio frequency propagation maps, as well as my review of existing and potential alternative sites, I concluded that the only feasible alternative to rectify Omnipoint's network coverage gap in the vicinity of the Property would be to construct a ninety foot (90') monopole at the Property and to install three panel antennas at a height of eighty-seven (87) feet center line of its antennas.

21. No other existing facility or location would remedy Omnipoint's coverage gap. Moreover, I found no other site available to Omnipoint from which the gap could be remedied.

22. I have reviewed the Affidavit of David Maxson, the City of Cranston's radio frequency expert, dated October 24, 2007.

23. In paragraph 26 of his affidavit, Mr. Maxson states that if Omnipoint reduced the height of its proposed monopole from ninety (90) feet to seventy-five (75) feet, it would be compliant with Cranston's Zoning Ordinance. While a shorter tower at the Property might meet certain of Cranston's zoning height requirements, it would not provide coverage adequate to remedy the coverage gap near the Property.

24. Mr. Maxson also correctly states in paragraph 28 of his affidavit that the proposed monopole would not satisfy Omnipoint's "self-imposed criteria for 'reliable service'" as its signal will not reach adjacent areas in Cranston. Indeed, given the limited range of radio frequency propagation, there is no single facility capable of remedying every existing coverage gap in Cranston. Indeed, not even the multiple sites that exist in Cranston (several are depicted in Exhibit 5, a true and accurate copy of a propagation map of Cranston, by an alpha-numeric code) provide complete, seamless coverage.

25. In paragraph 33 of his affidavit, Mr. Maxson states that if Omnipoint "seeks to grow 'seamless' in-building service in Cranston, then it is most productive to develop a more densely laid out network of smaller, lower-height facilities." A more dense design of wireless facilities would, however, create other zoning issues as, to reach its customers, more facilities would be required, many of them in residential areas.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 28th DAY OF NOVEMBER, 2007.

Elijah Luutu

ELIJAH LUUTU