UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 06-531ML

OMNIPOINT HOLDINGS, INC.,

Plaintiff,

v.

THE CITY OF CRANSTON, THE ZONINGBOARD OF REVIEW OF THE CITY OF CRANSTON and JOY MONTANARO, EDWARD DIMUCCIO, CURTIS PONDER, FRANK CORSO III, and DONALD CURRAN in their capacities as members of the City of Cranston Zoning Board of Review

Defendants.

AFFIDAVIT OF
DAVID P. MAXSON

I, David P. Maxson, hereby say that the following is true based on my personal knowledge and experience.

1. I am an adult citizen of the United States. I co-founded the radio frequency engineering firm Broadcast Signal Lab in 1982 and since then have been a Managing Partner and Principal Engineer. Broadcast Signal Lab has a principal place of business at 64 Richdale Avenue, Cambridge, Massachusetts, 02140. The firm provides engineering, design, construction, licensing and permitting services relating to radio communications facilities, including personal wireless services facilities. I have been engaged in this matter by the Defendants, The Cranston, Rhode Island and the Cranston Zoning Board of Review (collectively, “the City”, in context, “the City” or “the Board”, as applicable).

2. I have extensive experience in matters relating to the placement of personal wireless service facilities, including the radio frequency engineering, construction, and zoning and permitting of such facilities.

3. I have been a member of the Town of Medfield, Massachusetts Wireless Committee since its inception in 1996. In that time, several wireless bylaw modifications have been adopted, a wireless tower constructed, and municipal leasing of the Town water tank to three wireless carriers has occurred, all as a result of the Committee's recommendations.

4. I hold a Massachusetts Construction Supervisor License, number CS-073481, which recognizes my familiarity with construction practices and the Massachusetts Building Code, and entitles me to supervise construction in Massachusetts of structures up to 35,000 cubic feet volume. I also hold a Bachelor of Science degree in Broadcasting from Boston University. I have an FCC General Class Radiotelephone License, with radar endorsement; Society of Broadcast Engineers CBRE radio engineer certification; and recognition as a Senior Member of the Institute of Electrical and Electronics Engineers.

5. From 1978 to 1998, I was employed by Charles River Broadcasting Company, Waltham, Massachusetts, where I served as Vice President, Director of Engineering. At both Charles River Broadcasting and in my own business, Broadcast Signal Lab, I have been responsible for all facets of communications facility management, including tower management as each of the following: a tenant, a manager/landlord, and a builder of towers.

6. I have extensive experience in the field of radio frequency engineering, including designing, installing, maintaining, and upgrading radio frequency transmission and reception facilities, performing signal coverage and interference analysis, and preparing radio frequency allocations engineering, which involves identifying radio frequencies and

transmitted power levels that prospective radio communications facilities can utilize without causing interference in the radio spectrum. I also have been responsible for filing engineering statements with the Federal Communications Commission ("FCC") in support of license applications for those facilities. I also have designed and implemented programs and procedures to ensure that radio frequency facilities are in compliance with technical regulations and standards, and performed field measurements and analysis of radio frequency signals.

7. From 1988 to 1995, I provided services as a radio frequency engineering consultant to the New England operations of the licensed personal wireless service provider, Cellular One. Among the other numerous private, municipal and corporate clients I have served, I have also provided radio frequency engineering services to developers of personal wireless facility sites and towers. Since 1993, I have been engaged by municipalities to advise them regarding the placement, construction and maintenance of personal wireless service facilities. I am currently under contract with the Cape Cod Commission and several Massachusetts municipalities to assist with their local zoning review of proposed personal wireless facilities. In the past decade I have performed over one hundred such consultations with municipalities in five of the six New England states, including Rhode Island, plus New York and Pennsylvania.

8. I have testified as an expert witness in both federal and state court cases on matters of wireless communications facilities siting, including testimony in Omnipoint Communications v. the Town of Lincoln, Massachusetts, AT&T Wireless PCS, LLC v. the Town of Concord, Massachusetts, and SBA Tower v. the Town of Kingston, NH, among others.

9. The Commonwealth of Massachusetts Office of Business and Consumer Affairs has qualified me as a wireless mediator and engineering expert to assist parties seeking the Office's assistance in resolving disputes regarding the location of wireless facilities and other issues.

10. I was one of three experts in radio frequency energy safety who were appointed by the Commonwealth of Massachusetts in 1997 as an ad hoc committee to review and recommend changes to the Commonwealth of Massachusetts Department of Public Health Non-ionizing Radiation safety regulations (105 CMR 122.000 *et seq*).

11. I have authored and presented technical papers on radio frequency communications technology at radio engineering technical conferences, including topics on digital signal transmission measurement techniques, receiver susceptibility to interference, and data protocols for broadcasting digital information over the airwaves. I am the sole author of a technical book on a digital radio technology, <u>The IBOC Handbook; Understanding HD Radio Technology</u>, published by Focal Press.

12. I am a member of the National Radio Systems Committee's Digital Radio Broadcasting Subcommittee, which developed standards that establish a digital radio broadcasting service in the USA. As a member of the Subcommittee's System Evaluation Working Group, I was a principal author of major portions of its system test evaluation guidelines and two subsequent system test evaluation documents. The National Radio Systems Committee is sponsored jointly by the Consumer Electronics Association and the National Association of Broadcasters, which are both national trade organizations, to promote the development of standards and recommendations that promote beneficial uses of the radio spectrum.

13. Under my supervision, Broadcast Signal Lab performed an analysis of contemporary models of radio receivers to determine their susceptibility to certain kinds of interference. I wrote the report on this analysis, which was entered into the public record by my clients in an FCC Notice of Proposed Rulemaking in the matter of Creation of a Low Power Radio Service, Mass Media Bureau Docket #99-25. I presented a technical paper on the subject to the National Association of Broadcasters Engineering Conference and testified before the United States Congress, House of Representatives, Commerce Committee, Telecommunications Subcommittee on the matter in 1999.

14. In 2004 I was the project manager and lead engineer of my company's team of radio frequency specialists that executed a public health study commissioned by the US Air Force regarding public exposure to the emissions of the PAVE PAWS radar on the Massachusetts Military Reservation. I developed and validated a propagation model of the radar's radio frequency emissions. That model was employed by an epidemiologist to study whether there are any associations between disease rates and public exposure to the radar emissions. The study also involved, under my direct supervision, field measurement of radio frequency emissions to a high degree of accuracy. The results of the study have been made public and relied upon by the National Academy of Science for its congressionally mandated review. I directed a follow-up study, developed a testing protocol, and performed field measurements of the radar emissions for the Massachusetts Department of Public Health in 2007.

15. In reviewing applications for permits for wireless facilities tendered by personal wireless service providers to governmental entities, I employ my knowledge of the science of radio frequency signal propagation and communication, my knowledge of radio communications facility design and construction methods, and my familiarity with the

manner in which radio communications facilities must adhere to applicable requirements, such as land use regulation and building codes. My analysis employs methods and practices that are commonly employed by experts in the field, and/or based on common knowledge in the field, and/or rely on standardized methods adopted by open, consensus-based standardization bodies.

16. I am familiar with portions of the Federal Telecommunications Act of 1996 ("TCA") and have advised governmental entities, wireless communications companies, and other parties regarding compliance with numerous provisions of the statute and its subsequent implementations by the FCC.

17. I am familiar with FCC rules regarding personal wireless services under which FCC-licensed personal wireless service providers are licensed to operate.

18. I am aware that the TCA does not preempt local zoning as long as the local zoning does not prohibit or have the effect of prohibiting the provision of personal wireless services, does not unreasonably discriminate among providers of functionally equivalent services, and does not regulate placement of personal wireless facilities on the basis of environmental effects of the radio frequency emissions to the extent that they comply with FCC emissions regulations.

19. I have assisted numerous municipalities in the drafting of bylaws and ordinances that enable compliance with TCA requirements and in the review of proposed facilities subsequently regulated under such bylaws and ordinances.

20. I have assisted numerous municipalities in the execution of requests for proposals to site wireless facilities on municipal property and am thereby involved in bid review and lease negotiations with wireless carriers.

21. In the matter of the instant case, I have reviewed the following information supplied to me by the City: the Application to the Zoning Board of Review for Special Use Permit and Dimensional Variance for a Wireless Communication Facility dated September 21, 2005 ("Application") and submitted to the City by Omnipoint Holdings ("Omnipoint"); findings documents prepared by the Cranston Planning Commission dated November 9, 2005 and March 6, 2006 ("Planning Findings"); the Complaint filed by Omnipoint Holdings in this case ("Complaint"); the Notice of Decision and the Decision of the Board relevant to this matter ("Board Decision"); the Plaintiff's Expert Disclosure ("Disclosure") and attached letter, with further attachments, from designated expert Elijah Luutu to Attorney Worth ("Luutu Letter"); the Plaintiff's Summary of Its Claim in Response to Court's Rule 16 Order ("Plaintiff Summary"); relevant sections of the Cranston Zoning Ordinances ("Ordinance"); and other documents related to the filings in the case. I also am familiar with the general area of Cranston from previous work and have viewed it on topographic and aerial maps (collectively, the "View").

22. Based upon my review of the above documents, the View, and my technical knowledge and experience, it is my opinion that the Board's September 13, 2006 decision not to grant a special permit and not to grant a variance (Decision) for a telecommunications facility at the 1753 Phenix Avenue site ("Site") of the proposed Omnipoint facility, does not preclude other reasonable means to substantially satisfy Omnipoint's coverage objectives in the area of Cranston that it has targeted. With such likely alternatives, it is my opinion that the denial does not prohibit the provision of personal wireless services in Cranston. The reasons for this opinion are explained below.

23. Omnipoint has failed to demonstrate that it has standing in the present case. The only documentation of personal wireless service that it has submitted to the City of which I am

aware demonstrates Omnipoint's authorization to provide such service to the Boston market, not to Rhode Island. Omnipoint proffered two copies of Federal Communications Commission ("FCC") Station Authorizations (also known as licenses) to provide Personal Communications Service ("PCS") services under call signs KNLH310 and KNLF954 (Application, Tab 3). These licenses are to provide PCS services in the Boston Basic Trading Area ("Boston BTA") which is indicated by the designation "Market: Boston B051." Based on public information available from the FCC website (www.fcc.gov) the Boston BTA does not include any part of Rhode Island. Cranston, being in Rhode Island, is not covered by either of these two licenses. Therefore, Omnipoint has failed to demonstrate with evidence that it is a licensed personal wireless service provider in Cranston.

24. The Ordinance (§17.76.010.C.3.o) specifically precludes the construction of a monopole while the applicant specifically applied for permission to build a monopole (Application, Application Form Item 10, "flagpole design monopole"). Further, in my experience and in the definition of a "monopole tower" in the Ordinance, the flagpole style monopole is indeed simply a subset of the larger class of monopole tower that employs "a single pole, constructed without guy wires…" (Ordinance Telecommunications Definitions 7).

25. The Planning Commission Findings support the notion that, even at the Site, a design that is alternative to the monopole design could be worth consideration, suggesting the use of a "purpose build [sic] steeple could offer a creative compromise…"

26. The proposed tower exceeds the tower separation limits of the Ordinance (2.5 miles for towers 75 feet or more in height, Ordinance §17.76.010.C.3.n). Based on a cursory scaling of my maps, if the tower were reduced in height to less than 75 feet it appears the facility would be compliant with the lesser one-mile separation requirement. While

further work would be required to evaluate this prospect, Omnipoint failed to consider this alternative.

27. Omnipoint claims (Application, Tab 4, Affidavit of Elijah Luutu) that the proposed height of 90 feet is the "minimum height needed to ensure reliable PCS service to area residents, commuters and businesses…" Omnipoint submitted no evidence to support this assertion. Even if this assertion were true, Omnipoint did not consider the prospect of utilizing more than one facility to satisfy its purported coverage need.

28. Omnipoint employs a circular form of logic to define the targeted area by the coverage it purports to obtain from the proposed facility at the Site. Mr. Luutu asserts the proposed facility at the Site would "ensure reliable service to *area* residents," etc (emphasis added). He neglects to mention that even with the proposed facility, Omnipoint is left with additional adjacent areas in Cranston that do not meet its self-imposed criteria for "reliable service." Thus, the "area residents, commuters and businesses…" to which he refers are those within the area of the proposed facility's coverage. It would require new facilities in addition to the proposed facility to "ensure reliable service" as Omnipoint defines it to all of Cranston.

29. Rather than focus on identifying a single alternative facility that would provide a nearly exact duplication of the coverage obtainable from the proposed facility at the Site, Omnipoint could consider rearranging the placement of its proposed facility and any future facilities it would require to "ensure reliable service" throughout Cranston. Such a rearrangement could also be designed to take advantage of existing buildings and other structures in a manner more compliant with the objectives of the Ordinance.

30. On the alternative facility location at the Fire Museum, the site is dismissed as subjecting the Omnipoint equipment to interference from a "Radiophone" at the site (Luutu Letter).

Without further documentation of the purported interference mechanism, in my opinion this assertion is baseless. Radio frequency interference is largely a manageable concern employing numerous strategies to prevent harmful interference from occurring at two co-located facilities.

31. With his Luutu Letter, Mr. Luutu also appends some maps displaying drive test data on existing coverage in the area of the Site and overlays projected coverage from the proposed facility. In my experience, including experience reviewing and observing other drive testing performed by Omnipoint in the region, there are potential errors and discrepancies between computer estimated coverage modeling and drive test data collection that render such comparisons useless. Omnipoint should publish its drive test methodology and explain how the differences between drive testing and computer modeling are reconciled.

32. Omnipoint makes no submission explaining how its coverage analysis by computer estimated coverage plot is representative of any purported gap in service. The analysis employs a signal level of -84 dBm and the supporting explanations proclaim the computer software is "complex" (Luutu Letter). In my opinion, this evidence is vague and unsubstantiated and it is insufficient to define where and to what extent a gap in service exists, if any does at all.

33. Omnipoint makes a point of suggesting that both its in-vehicle coverage and its in-building coverage must be provided to the targeted area of the proposed facility at the Site (Luutu Letter, "to provide seamless coverage to the vehicles, residences, and other buildings within that area…"). However, the coverage plots provided in the Application (Tab 4) fail to show more than the in-vehicle signal level. In my experience with Omnipoint applications in the region, the figure used on those maps (-84 dBm) is

Omnipoint's in-vehicle coverage target threshold. Omnipoint employs a much more stringent threshold for in-building coverage. Consequently, while Omnipoint may believe it is showing its expectation of "seamless coverage" for vehicular service in certain parts of Cranston with the addition of the proposed facility, Omnipoint fails to show that in fact, its in-building coverage even with the addition of the proposed facility would not be "seamless" in Cranston. To truly obtain "seamless" in-buliding coverage in Cranston, a much larger number of facilities would be necessary. If Omnipoint indeed seeks to grow "seamless" in-building service in Cranston, then it is most productive to develop a more densely laid out network of smaller, lower-height facilities, typically employing existing buildings and structures such as utility poles.

34. In conclusion, Omnipoint did not fully explore alternatives to the proposed 90-foot monopole tower. Omnipoint's claims regarding a gap in service are thinly substantiated by vague assertions about in-vehicle and in-building coverage needing to be "seamless" in Cranston without identifying accurately and with substantiation, if at all, where the purported gap is—employing circular logic to define the purported problem by the solution proposed.

David P. Maxson

Signed under the penalties of perjury, this 24th day of October, 2007.