UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| OMNIPOINT HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF CRANSTON, THE ZONING BOARD OF REVIEW OF THE CITY OF CRANSTON and JOY MONTANARO, EDWARD DIMUCCIO, CURTIS PONDER, FRANK CORSO III, and DONALD CURRAN in their capacities as members of the City of Cranston Zoning Board of Review,<br><br>Defendants. | ) | C.A. No. 06-531-ML-DLM |

MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION[1]

This suit is brought by Omnipoint Holdings, Inc. ("Omnipoint"), a Delaware Corporation which sought a dimensional variance and special use permit before the City of Cranston Zoning Board of Review. Omnipoint sought to place a 90 foot tall monopole containing PCS antennas in an area less than the setback required by the applicable Cranston zoning ordinance.

The request was the subject of numerous hearings, where evidence and testimony were taken. The hearings were held before both the Cranston Planning Commission and the Cranston Zoning Board of Review.

On November 7, 2006, the Zoning Board issued its Decision denying the requested dimensional variance and special use permit. This suit was commenced on or about December 7,

[1] Exhibits Attached to Omnipoint's Statement of Undisputed Facts are referred to as "PX," for "Plaintiff's Exhibit." Defendants' Exhibits are referred to as "Exh."

2006, some 30 days after the Zoning Board of Review issued its decision.

Plaintiff has moved for Summary Judgment based upon its contention that the denial of its application constitutes an “effective prohibition” against its providing wireless telephone service in violation of the federal Telecommunications Act.

For the reasons which follow, defendants respectfully submit that Summary Judgment is not appropriate in this matter and, therefore, pray that plaintiffs Motion for Summary Judgment be denied.[2]

## II. ARGUMENT

Omnipoint’s Motion is based solely on its contention that the denial of its application to build its monopole at the requested location violates the provisions of the provisions of 47 U.S.C. Sec. 332(c)(6)(B)(i)(II), which override local government actions that “prohibit or have the effect of prohibiting the provision of personal wireless services.” It is important to note that Omnipoint does *not* assert that the decision of the Zoning Board of Appeals lacked a foundation

[2] A substantial question exists whether Omnipoint is even an appropriate party to this suit. Mr. Maxson’s Affidavit, PX11, Par. 23 notes that the licenses originally referred to in Omnipoint’s Expert Disclosure included licenses for the Boston Area. In the Motion for Summary Judgment, Omnipoint appears to seek to address that issue by producing a) two licenses – *issued to T-Mobile License, LLC and Cook Inlet/VS GSM VII PCS, LLC* (PX6), and b) the Affidavit of Gerald Marquis (PX 7) who asserts, inconsistent with the licenses produced, that “Omnipoint ... is licensed by the [FCC]....” PX7, Par. 3. Omnipoint claims to be a “wholly owned subsidiary of T-Mobile USA, Inc.” (Marquis Aff., PX7, Par. 3), and claims that PX 6 is “[a] true and copy [sic] of Omnipoint’s license....” Marquis Aff., PX7, Par.3. Exhibit A, from the FCC license search web site (http://wireless2.fcc.gov/UlsApp/UlsSearch/searchLicense.jsp) reveals that there are apparently no FCC licenses issued to Omnipoint Holdings, Inc. and that, in Rhode Island, there are no “CW” service (PCS Broadband) licenses issued to Omnipoint Holdings. This inconsistency, alone, raises a question of material fact as to whether, in fact, Omnipoint is licensed to operate wireless facilities in Cranston. Defendants do not know if there is some chain of documentation which establishes Omnipoint’s rights in this regard – Defendants simply don’t know and Omnipoint has not established this material fact as undisputed.

of "substantial evidence."[3]

Omnipoint offers a two-step argument: First, Omnipoint claims that there is, in the area where it seeks to construct its antenna, a "significant gap" (Omnipoint Memo., p.1) in coverage. Second, Omnipoint asserts that the denial of a permit to construct a monopole antenna as prayed "effectively prohibits" the closing of this gap. *Id.*. In the process of urging this Court to conclude that such an effective denial has been established, Omnipoint asserts that this particular location, and this particular configuration, is the "only feasible alternative" for remedying this gap. *Id.*

In making its arguments, Omnipoint eschews statute, regulation and caselaw, in favor of its own self-serving and unsupported definitions and interpretation of applicable principles.[4] However, as will be demonstrated, simply applying the right label to the wrong facts affords no legal relief. Upon closer inspection, it is clear that Omnipoint's suggestion that there are undisputed facts which entitle it to Summary Judgment is without merit and, to the contrary, the undisputed facts may well fatally undo Omnipoint's case.

A. Legal Standard.

Omnipoint claims that the denial of this particular application is an "effective prohibition" of service, in violation of the Telecommunications Act's admonition that the actions of local governments cannot "prohibit or have the effect of prohibiting the provision of personal wireless

---

[3] Omnipoint's Memorandum, p.9, n.1.

[4] Among other things, Omnipoint asserts that the closing of this particular claimed "coverage gap" is necessary for Omnipoint to fulfill its "obligations under its FCC license to the consumers within that area." Omnipoint Memorandum, P.3. Aside from the fact that Omnipoint cites no regulation or statute consistent with this asserted "obligation," the assertion is highly dubious considering Exh. B, which clearly depicts that this particular location is not a marked departure from otherwise seamless coverage in Cranston or the State of Rhode Island (Omnipoint claims that it is a wholly-owned subsidiary of T-Mobile – Marquis Aff., PX7, Par. 3). Indeed, Omnipoint's own Exhibits establish that, even with multiple sites, "seamless" coverage will not be attained. PX8, Par. 24.

services." 47 U.S.C. Sec. 332(c)(6)(B)(i)(II).

In order to prevail on an effective prohibition claim, Omnipoint has the burden of establishing both that Cranston's zoning decision and ordinances prevent the closing of a "significant gap" in coverage and that further reasonable efforts are "so likely to be fruitless that it is a waste of time even to try." *Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002).[5] Omnipoint's burden, as a matter of law, "is a heavy one." *Cellco Partnership v. Town of Grafton*,[6] 336 F.Supp.2d, 71, 83 (D.Mass. 2004), *citing Town of Amherst v. Omnipoint Communications, Enterpr., Inc.*, 173 F.3d 9, 14 (1st Cir. 1999).

Where, as in this case, an effective prohibition claim is based upon a particular decision (as opposed to a blanket prohibition contained in an ordinance or enacted criteria which, though facially objective, effectively preclude wireless service), the Plaintiff has the burden of establishing that the "existing application is the only feasible plan." *Cellco*, 336 F.Supp. at 83, *citing Second Generation*, 313 F.3d at 630.

---

[5] By contrast, Defendants have no burden: "We doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower, simply to defend themselves from an easily made accusation in court that an individual denial of a permit amounts to an effective prohibition." *Nat'l Tower, LLC v. Plainville Zoning Bd.*, 297 F.3d 14, 24(1st Cir. 2002).

[6] *Cellco* is cited and quoted extensively in this Memorandum. While each of the principles enunciated in *Cellco* bear their own citations in support, because both the facts and procedural posture of *Cellco* lend themselves to citation under the circumstances existing in this case, Defendants have relied on this District Court decision to a large extent. In *Cellco*, a carrier's application to construct a wireless facility was denied by a local authority. Cellco claimed that the denial was an effective prohibition of its covering a significant coverage gap. On Cross-Motions for Summary Judgment, the *Cellco* Court denied Summary Judgment for the carrier and granted it in favor of the Town of Grafton.

1. Omnipoint Has Not Established A "Significant Coverage Gap."

In this case, while Omnipoint has offered evidence of a "coverage gap," it offers no convincing support, other than its own say-so, that the gap which it claims qualifies, *legally*, as a "significant coverage gap."

a. Omnipoint's Criteria for Establishing a "Gap" is Unsupported.

"A gap in wireless services exists when a remote user of those services is unable to either connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication."' *Omnipoint Communications v. Town of Lincoln*, 107 F. Supp.2d 108, 118-19(D.Mass. 2000). A "significant gap" must be contrasted with "a mere, and statutorily permissible, dead spot. Federal regulations contemplate that areas enjoying adequate coverage will still include spots without reliable service." *Second Generation* at 631, *citations omitted*, *citing* 47 C.F.R. § 22.911(b) (2001); § 22.99 (defining dead spots as "small areas within a service area where the field strength is lower than the minimum level for reliable service").

First of all, Omnipoint's claim of the existence of a coverage gap is predicated on the self-imposed standard that signal strength be better than -84dBm.[7] In fact, there is no objective criteria which establish that signal strength below this level establishes the existence of a coverage gap. Mr. Maxson has asserted that this purported threshold does not establish, in and of itself, a "gap" in coverage. Maxson Aff., PX11, Par. 32. Further, as Mr. Maxson notes, Omnipoint has

[7] Although not fully explained in Omnipoint's Motion and supporting papers, it is Defendants' understanding that, for purposes of this Motion, signal strength is described in 'decibel milliwatts' or dBm's. The signal strengths Omnipoint relies on are expressed as negative numbers. Hence, the threshold strength which they advocate is -84 dBm. A *stronger* signal will be a *lower* number (*i.e.*, -74 is a *bigger* number than -83), and a *weaker* signal will be a *higher* number (*i.e.*, -92 is *smaller* than -83). For example, in PX4, the *strongest* signal is depicted in blue as "[b]etter than -76 dBm" and the *weakest* signal is depicted in yellow as "-92 dBm."

not even attempted to show what "in-building" signal levels would be, so has not even addressed either the existence of a "coverage gap" in buildings or whether its proposed antenna location would address any such "gap." Maxson Aff., PX11, Par. 33.[8]

In *Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Bd. of Easttown Twnshp.*, 331 F.3d 386 (3rd Cir. 2003) the Court noted that Omnipoint's claim that a signal strength above -85 dBm is required to provide reliable service was rejected by a United States Magistrate Judge. The Magistrate Judge noted the absence of any standard establishing that signal level as a measure of a 'gap' in coverage. The Magistrate Judge specifically rejected detailed data (not offered in this case) concerning both dropped calls and 'no service' areas.[9] In sum, "The Magistrate Judge therefore concluded that where the drive test data does not support the expert opinion that weak signal strength results in unreliable service, Omnipoint has not met its burden of establishing a significant gap in coverage." *Omnipoint v. Easttown*, 331 F.3d at 398-99.[10]

---

[8] Exh. C, produced by Omnipoint in discovery in this matter indicates that the "Best Server" signal strengths are ">=-84 dBm" "In Veh" and ">=-76dBm" "In Bldg." These notations are consistent with Mr. Maxson's point that Omnipoint has a 'more stringent' standard for "in-building" service which is not addressed anywhere in its Motion for Summary Judgment. Having said that, Defendants do not accept that evidence of whether a particular location meets, or does not meet, Omnipoint's own "best" signal level establishes any gap, or not, in coverage.

[9] The reliability of drive test data is questioned by Mr. Maxson (as it was by the Magistrate Judge in *Easttown*), Maxson Aff., PX11, Par. 31, rendering assertions of the value and meaning of such drive data a material fact in dispute. Again, the burden is entirely on the Plaintiff so raising such a question *ipso facto* establishes material facts in dispute.

[10] To some extent, this discussion in *Easttown* was in the form of *dicta*, insofar as it was set forth as prelude to the Court's main concern, which was whether a gap is to be considered only based on the applicant's service, or the service of other providers in the area allegedly subject to a coverage gap. *Omnipoint v. Easstown*, 331 F.3d at 399. That issue is discussed *infra*. However, it does seem fair to suggest that the Third Circuit had no qualm with the Magistrate Judge's rejection of the -85 dBm standard (argued in that case) as the yardstick by which 'coverage gaps' are measured.

Indeed, T-Mobile's[11] own published data contradicts its 'expert's' claim of coverage gaps. Attached hereto as Exh. D are "Personal Coverage Check" maps from T-Mobile's web site, www.t-mobile.com/coverage/ . Using the address of the proposed monopole at issue in this suit, it is clear that there are *no* literal coverage gaps. The second page of Exh. D is a blowup of the map shown on page 1, with numbers inserted indicating the signal strength expressed as number of "bars" on page 1 of Exh. D. As can be clearly seen, the vast bulk of Phenix Avenue where coverage is claimed to be subject to a "gap" is in the two-bar-covered section. Exh. B is a zoomed out map showing the same coverage in a larger context and it is clear that T-Mobile, in its own web site, is telling consumers that the very same area where it claims there is a coverage gap, in fact, has coverage.

Certainly, even within its own papers, Omnipoint seems to concede that, even on its best day, there will not be "seamless" coverage. Luutu Aff., PX8, Par. 24. Therefore, the issue of what gaps are "significant" and others which, by contrast, are not "significant" is a legal question for which Omnipoint offers absolutely no evidence or legal analysis.

Finally, Omnipoint seeks to equate, with no legal or factual support, a potential "dropped call" in a moving vehicle with a gap in coverage. There is not one whit of evidence offered regarding the availability or quality of service and likelihood of dropped calls to a *stationary user* in any of the area where the purported coverage gap exists[12]. To the contrary, T-Mobile's own

---

[11] Omnipoint, according to Mr. Marquis' Affidavit, PX7, Par. 3, is wholly owned by T-Mobile.

[12] In *Easttown*, the Third Circuit noted, with apparent approval, the United States Magistrate Judge's finding of the absence of a "coverage gap" despite the fact that calls were "dropped" where made in moving vehicles. Of note in that case, the service of *other providers* was considered, and the Court was provided a substantially greater degree of detail and data than Omnipoint offers in this case. Despite this, the Magistrate Judge still found no 'coverage gap' for purposes of the Telecommunications Act. *See Easttown*, 331 F.3d at 398-99.

web site indicates coverage throughout the area. Even in the "drive test" data, showing purported signal strength (PX3), there is no indication that, in any given location, there is no service whatsoever.[13]

In sum, the determination of whether the self-defined "gap" in coverage which Omnipoint points to is a *legally* "significant gap" such that the failure to 'fill it' constitutes an effective prohibition of service for purposes the Telecommunications Act is a determination which requires resolution of disputed material facts.

b. Omnipoint's "Facts" are Contradictory, Confusing and Raise More Fact Issues than they Resolve.

Omnipoint's exhibits are confusing and contradictory and leave many fact issues unresolved and, therefore, for purposes of a Motion for Summary Judgment, not established. For example:

- PX2 and PX4 are inconsistent in the area depicted as having a coverage gap.
- 4PR0636A appears to be on PX2, but not PX4; RI151 and RI149, on PX3 are not similarly identified on PX2; PR636 appears on PX3, but is mysteriously absent on PX4.
- PX 2 depicts various towers and wireless facilities with designations which do not

[13] Although not stated in its Motion, Omnipoint's desire to improve a 'dropped call' dilemma appears clear in Exh. E, produced by Omnipoint in discovery. This document indicates, as the "justification" for the newly sought location, a number of dropped calls in what can only be understood to be moving vehicles within the claimed area of "coverage gap." Interestingly, the "coverage objectives" listed in Exh. E are to provide coverage to customers and "resolve drops on RI145A." The reason this should be of interest to the Court is that, to the best of Defendants' knowledge, Omnipoint does not identify in any of its papers the location or coverage of "RI145A," which leads to a question of material fact regarding exactly what coverage exists in the supposed area of the "gap." Put another way, it appears that there is additional coverage which Omnipoint has chosen not to bring to the Court's attention. Worth noting, as well, is the "Comment[]" indicating what Omnipoint claims is "[e]xceptional [sic] poor Telephia drive test results." In sum, it appears that Omnipoint's issue is dropped calls in moving vehicles and not a gap in coverage. Omnipoint does not offer a single citation to any caselaw which equates dropped calls in a moving vehicle with a "coverage gap."

match those on Exh. F, a list provided in response to Defendants' Interrogatories.[14]

- Among the "coverage objectives" of the new site are "resolve drops on RI145A" 145 (Exh. E), but tower RI145A is not apparent on any of Omnipoint's exhibits.

Where Omnipoint seeks Summary Judgment, it is respectfully suggested that its supporting documents and assertions should be self-explanatory and not require Defendants or the Court to employ protractors, rulers and otherwise try to 'match' facilities which bear different designations in its own Exhibits. Confusing as Omnipoint's Exhibits are, it appears clear that there are numerous material issues of fact in dispute insofar as Omnipoint has not clearly set forth facts which establish any legal entitlement to judgment, much less established them as undisputed.

c. <u>Omnipoint Has Not Considered Coverage by Other Carriers.</u>

A "significant gap" exists when a purported geographic gap, served by *no carrier*, is large enough in terms of physical size and number of users affected to amount to an effective prohibition. *Second Generation*, 313 F.3d at 631. "In ascertaining the existence and extent of

---

[14] Omnipoint's Answers to Interrogatories, Exh. G, provided the list which is attached as Exh. F, which it says are "16 facilities within four miles of the proposed site...." (Answer to Interrogatory No. 2). Those designations use the format of the number "4" in this first position, consistent with PX2. Separate and apart from this naming convention being inconsistent with other exhibits, Defendants have been unable to locate "4FR4050B" on PX2. It is possible that this designation refers to "4FR40***2***0" as depicted on PX2, but this is not certain. To confuse matters further, and notwithstanding the legal importance of coverage provided by other carriers, Omnipoint did not provide information regarding communications facilities which it does not use. Answer to Interrogatory No. 3. As a result, this Court is entirely without information from which it can determine whether co-location at an existing facility, as opposed to construction of a new facility, is a feasible way to achieve better coverage in the area which Omnipoint seeks to address. Having referred Defendants to "publicly available sources" (Answer to Interrogatory No. 3), the assertion by Omnipoint in Answer No. 4, that there are "no existing sites owned or leased by another carrier within one and a half miles of the proposed site" is highly suspect. As noted on Exh. H, it appears that there is a cell phone tower owned by New Cingular Wireless Services, Inc. located on Governor's Hill approximately one mile from the proposed site. That facility does not appear to be depicted on *any* of Omnipoint's Exhibits, and certainly not in PX3 or PX4.

coverage for purposes of resolving an effective prohibition claim (and indeed the proposed solution), we hold it permissible to consider *(1) roaming service, (2) the coverage provided from towers in other towns, and (3) service by carriers not licensed in the jurisdiction at issue*." *Second Generation*, 313 F.3d at 632 (emphasis added).

Omnipoint has not offered this Court any analysis of whether there is coverage by other providers within the area claimed to have a coverage gap. The Court does have sufficient information to conclude that there is a material issue of fact as to whether such coverage exists and, as such, Summary Judgment is improper.

Omnipoint's expert has stated that Omnipoint's PCS system has a lower transmission distance than other types of technology.[15] PX8, Par. 9. Therefore, the failure to offer this Court an analysis of the coverage of other providers in the area of the purported "gap"gives this Court absolutely no basis to conclude that there is even a coverage gap, much less a significant one, *as defined by the Courts*, and not as defined by Omnipoint. In addition, Omnipoint offers this Court no information regarding the availability of roaming services in the area of the purported coverage gap and, without this information, it cannot be discerned, again, whether a *legally defined* coverage gap exists.[16]

---

[15] Omnipoint states that PCS technology permits numerous features beyond voice transmission ("secured transmissions and enhanced voice, high-speed data, paging and imaging capabilities, as well as voicemail, call forwarding and call waiting" PX8, Par. 7.) What Omnipoint fails to do is address whether the claimed "coverage gap" affects these additional features and/or voice transmissions, leaving a substantial factual question and, as well, a legal question of whether a 'gap' in coverage of these additional services falls within the legal definition of a "coverage gap."

[16] The failure to provide information regarding roaming services is perhaps explained by the fact that T-Mobile's web site indicates the current existence of coverage in the area at issue and, hence, roaming service is apparently not needed. *See* Exh. D.

2. Omnipoint Has Not Established That the Solid Rock Church Site is the Only "Feasible" Site.

"For a telecommunications provider to argue that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a *full* effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers." *S.W. Bell Mobile Sys. v. Todd*, 244 F.3d 51, 59-60 (1st Cir. 2001)(emphasis added), *cited in National Tower*, 297 F.3d. at 24.

"The feasibility of alternatives is a fact-intensive determination, and the plaintiff bears a heavy burden to make the appropriate showing." *Cellco*, 336 F.Supp.2d at 83, *citing Amherst*, 173 F.3d at 14. The *Cellco* Court found that Cellco did not sustain its burden, because it did not show that a single facility on the proposed site was the only "technically feasible" option. *Cellco,*, 336 F.Supp.2d at 83, *citing Amherst*, 173 F.3d at 15.

Defendants' consulting expert, David Maxson, whose Affidavit is attached to Omnipoint's Statement of Undisputed Facts (PX11), ultimately concludes[17] that the denial of Omnipoint's request to construct a monopole tower at the Solid Rock Church "does not preclude other reasonable means to substantially satisfy Omnipoint's coverage objectives in the area of Cranston it has targeted." PX11, Par. 22 [18]

In opining regarding the feasability of sites, Mr. Luutu considers sites based solely on the 'list' provided to him. PX8, Par. 19. There is absolutely no comprehensive analysis of other possible locations by Mr. Luutu. He simply defers to the site selection team and then claims to

---

[17] For reasons further set forth in his Affidavit.

[18] Ironically, Omnipoint accuses Defendants' expert as making "bald assertions" (Omnipoint Memorandum, p12) when Omnipoint's entire argument is built on bald assertion upon bald assertion. Not only is the accusation lobbed at Mr. Maxson hypocritical, but it ignores the fact that Defendants have no burden of proof in this matter.

evaluate from a technical point of view what the predicted coverage would be – and if the site selection team excludes a site, for any reason, it comes off Mr. Luutu's list of possibilities.[19] It is particularly noteworthy that Mr. Maxson, Defendants' expert, has pointed out the possibility of a reconfigured network, a multiple site solution and other options not considered (or at least not offered) by Omnipoint. Instead of a substantive response, Omnipoint takes pot shots *where Defendants have no burden*. *See* Luutu Affidavit, PX8, Par. 23-25.

a. Omnipoint Impermissibly Relies On its own Network Design Preference.

In order to override the lawful results of a local zoning board's denial of an application for a cell phone tower, a provider is not at liberty to restrict itself to its own preferred delivery model. Instead, it must prove, in effect, that it has considered alternative solutions to remedy coverage gaps (if, legally, they exist), 'outside the box' of its own self-defined model.

As noted in *Cellco:*

> The First Circuit's analysis in *Amherst* suggests that a Town might require a provider to rethink its network design." *See Amherst*, 173 F.3d at 14-15. In *Amherst*, the court pointed out that although a provider may desire the most efficient and cost-effective system, using "standard height towers at optimal locations," the provider must be willing to consider and present to localities other feasible alternatives available to them, even those that entail using lower towers and multiple site solutions.

*Cellco*, 336 F.2upp.2d at 84.

In this case, Omnipoint, as in the case of how it chooses to define a 'coverage gap,' self-defines feasability in a self-serving manner that entirely fails to meet its burden in establishing that the selected site is the only "feasible" site. As will be seen, Omnipoint takes an outcome-driven

[19] Similar acceptance, by Mr. Luutu, of certain sites being off the table,, were criticized by the Court in *National Tower*, 297 F.3d at 24, n.4. Where Mr. Luutu based his exclusion of potential sites on such hearsay claims that sites were not available due to inability to obtain a lease, for example (as he does in this case), the Court stated: "[s]uch a qualification would make Luutu's statement inadmissible, for example, to support summary judgment in federal court." *Id.*

approach to its analysis which essentially seeks to substitute its own convenience for true feasibility.

First of all, Omnipoint's entire approach to site location starts with its basic premise/preference that its network resemble a "honeycomb" pattern. Luutu Aff., PX8, Par. 10. As can be seen in the illustration at right, this approach minimizes overlap and, thus, is likely the most cost-efficient approach. While this may, from a business standpoint, be desirable, using this model as the underpinning for an argument that a single location is the only "feasible" location for correction of a coverage gap is fallacious.



It is clear that a coverage gap could be remedied in a variety of ways:




In this case, Omnipoint appears to want to cover each hexagon coverage area with a centrally located facility – in this illustration, something in the area of "B." In fact, as can be seen, non-centrally located facilities can, in the alternative, provide the same coverage at the expense, perhaps, of efficiency. In the illustration, it can be seen that some combination of facilities other than within the immediate area of "B" can provide coverage within the hexagonal honeycomb cell of a 'grid.'

Having in mind these principles, Omnipoint's assertion that the location where it seeks to erect its monopole is the only "feasible" site falls apart.[20]

---

[20] Interestingly, and somewhat disturbing, is the fact that, in his initial expert disclosure, Exh. I, Mr. Luutu's criticism of the Fire Department Site was that "radiophone at that site would cause too much radio interference to allow for PCS installation." Exh.I, P.3. Mr. Luutu did not, at that time, even suggest that the Fire Department Site was not feasible because it would not remedy the coverage gap. This new contention, contained in PX8, Par. 19, seems to be in

Mr. Maxson has noted the fact that Omnipoint's entire argument is built on the premise that a single site be used according to and consistent with Omnipoint's preference for minimal overlap by way of a network consisting of a grid of facilities resembling a honeycomb. Maxson Aff., PX11, Par. 27-29. In *Cellco*, this exact myopic approach was rejected:

> Finally, Cellco does not appear to have adequately considered the possibility of *reconfiguring its network*, or using cell sites from outside Grafton Center to provide service within Grafton Center. *See Second Generation*, 313 F.3d at 635 (holding that the provider failed to show that other potential solutions, such as a taller tower or a site in another jurisdiction, could not cover the gap in services).

*Cellco*, 336 F.Supp.2d at 84(emphasis added). In addition, the *Cellco* Court specifically faulted Cellco's failure to consider the possibility that there may have been other single or multiple site solutions that would have provided adequate coverage in the claimed gap. *Id.* at 83.

Where Omnipoint has defined "feasibility" strictly in terms of its own preferred design, for efficiency and cost reasons, it has not established the absence of issues of material fact and, thus, Summary Judgment is not appropriate.

b. <u>Omnipoint Defines "Feasibility" Within the Context of a "Search Ring" Tailored to its own Convenience.</u>

While not explicated in any degree, the Affidavit of Shayana Cordova, PX9, Par. 4 indicates that the Omnipoint site acquisition team looks for sites *only within* a "search ring."

---

response to Mr. Maxson's pointing out that radio interference is a common matter that could be managed. Maxson Aff., PX11, Par. 30. Mr. Luutu also discounted, in the expert disclosure, the Golf Course site because it would be "unsuitable" because of its "proximity to the facility being installed on the lattice tower northwest of the Property." Exh. I, P.1-2. Again, redundancy, at that time, seemed to be Mr. Luutu's yardstick for suitability, not comprehensiveness of coverage. As Exh.'s J and K demonstrate, the Golf Course location would provide coverage in the Southwest portion of the purported 'gap' at the expense of the Northeast area while the Solid Rock Church site would reverse that supposed deficit. PX4. Now ( Exh.8, Par. 19) Mr. Luutu's rejection of the Golf Course site is based on nothing more than supposed unavailability, based on the say-so of the site acquisition team.

What the parameters of this 'search ring' are, exactly, are never made clear.[21] It can be surmised that the "search ring" is an area relatively central to a hexagonal honeycomb grid cell, which would provide coverage throughout the grid cell. This interpretation is consistent with Mr. Luutu's Affidavit, PX8, Par. 10, where he describes (and bases his opinions on the need for) coverage in a honeycomb grid pattern.

A review of Omnipoint's own "Site Acquisition Information Candidate Form" Ex. N, as produced in discovery in this matter, raises at the very least material issues of fact as to whether sites outside the undefined "search ring" are potentially feasible and whether alternatives to monopoles would be feasible. The form itself makes it clear that site "candidates" may be outside the search area: the form specifically contains a box where either "yes" or "no" can be checked in response to the question "is site within search area."

Furthermore, the Site Acquisition form provides for some six different types of towers, as well as six other 'non-tower' applications and a 'fill in' "other" category. Thus, the assertion, at page 5 of Omnipoint's Memorandum, that the Solid Rock Church site is the "only other potential site that offered sufficient land on which to build a *monopole* structure" (emphasis added) leaves open the question of whether some other type of structure, or structures, in different configuration or combination, could resolve the purported coverage gap. Omnipoint's 'feasibility'

---

[21] Although Omnipoint never defined, for this Court, the extent of its "search ring" for the alleged coverage gap at issue in this case, it did provide what appear to be examples of the scope of such a "search ring" in discovery, Exh.'s E, L, which is the "search ring" for a facility desiganted as "4PR0646." Defendants believe this is the area of concern in this suit, as it encompasses most of the portion of Phenix Avenue, (Route 51) which Omnipoint asserts is the subject of a coverage gap. Exh. M is marked with the approximate locations of the three sites which Omnipoint asserts are, effectively, the 'only' three potential sites within the area where they seek to provide coverage. Omnipoint has offered no convincing evidence that its self-limited universe of three choices truly represents the full range of sites (individually or in concert) which could 'feasibly' provide coverage within the purported coverage gap and, as such, a material fact remains in dispute.

argument considers only a monopole design – in Shayana Cordova's Affidavit, PX9, Par. 17, it is stated that the only properties considered were those large enough to accommodate a *monopole* design. Because there are numerous other potential forms which a wireless facility could take, Omnipoint has not established, consistent with *its "heavy" burden*, that there are no other feasible sites.

Thus, it appears that there is a fact question, at least, as to whether the sites considered are all those sites which could serve the purported coverage gap or whether they are limited to those allegedly suitable for a monopole in a self-defined 'search ring' which represents less than all the geography in which a feasible site to cover the contested area, with a signal strength to Omnipoint's self-imposed standard, exists.

In sum, Omnipoint, without any reason beyond its own say-so, defines the universe of 'feasible' locations for cell service as three discrete locations, and then eliminates two. In each case, the elimination of a site is based on faulty logic and unsupported assertions.

c. The Golf Course Site has not Been Demonstrated to be Infeasible.

As noted above, while a provider may desire the most efficient and cost-effective system, the failure to consider and prove that there are no feasible alternatives, even if not as economically satisfying, precludes a Court's finding an effective prohibition. *See, Second Generation*, 313 F.3d at 635 (listing a range of possible solutions that the provider failed to demonstrate were not technically feasible, including: different tower height, sites outside the search area, other existing facilities, roaming coverage). In *Cellco*, the Court specifically rejected claims of a single-facility solution where the carrier did not consider the possibility of "*reconfiguring its network*." *Cellco*, 336 F.Supp.2d at 84 (emphasis added).

With respect to the Golf Course site, Omnipoint offers a totem-pole of hearsay assertions

to the effect that a proposed payment of $25,000.00 failed to resolve an impasse. That alleged impasse, according to Omnipoint, renders the site not feasible.[22] The question of whether the claimed failure of a $25,000.00 incentive establishes infeasibility is a material question of fact which renders Omnipoint's conclusion unsupported for purposes of a Motion for Summary Judgment.

The Site Acquisition Candidate Form for the Golf Course location, Exh. O, anticipates a lease with four five year renewable terms, and a monthly rental of "over $1,500" per month. Thus, Omnipoint apparently expected to pay, over twenty years, more than $360,000.00 in rental fees for this location, plus the cost of constructing the tower. In light of that sum, Defendants respectfully suggest that the failure of a $25,000.00 incentive to resolve an impasse does not establish, as an undisputed fact, that the Golf Course site was not legally "feasible."

d. Omnipoint has not Established that the Fire Department Museum Site is Infeasible.

With respect to the proposed site at the Fire Department Museum, Mr. Luutu states that a facility at that site would be "redundant" and would not "remedy" the supposed "coverage gap". (Luutu Affidavit, PX8, Par. 19). Respectfully, neither of these assertions establish infeasibility.

Redundancy does not, under any legal standard, establish infeasibility. As noted in *Cellco*: "The options that remain ... may be more difficult and expensive than the proposed single site solution. But the TCA does not offer providers the best or cheapest option." *Cellco*, 336 F.Supp.2d at 85, *citing*, *generally*, *Amherst*, 173 F.3d at 15.

[22] Mr. Luutu accepts, at face value, the information provided to him that the Golf Course "was not available." PX 8, Par. 19. As noted above, in *National Tower*, 297 F.3d at 24, n.4, Mr. Luutu's reliance on hearsay to exclude sites was deemed insufficient to establish any facts (even were the alleged facts sufficient otherwise) sufficiently for purposes of a Summary Judgment Motion.

Similarly, the claim that the Fire Department Museum location would not remedy the coverage gap falls flat. Omnipoint did not provide this Court with propagation prediction maps for that site in its Motion for Summary Judgment, but it did provide them in response to discovery requests. Bearing in mind the assertion by Mr. Luutu, Luutu Aff., PX 8, Par. 15, that the area which comprises the so-called “gap” is “bordered by Hope Road, Phenix Avenue and Burlingame Road,” it is clear that any distinction between coverage which is predicted based on a facility at the Solid Rock Church *versus* one at the Fire Department Museum site is fallacious.

As can plainly be seen on PX4, a portion of the asserted gap is not covered by the proposed site. Thus, Mr. Luutu’s ‘solution’ leaves a significant portion of Phenix Avenue, Southwest of Burlingame Road without ‘coverage’ (as self-servingly defined by Omnipont). Comparing the predicted coverage from a monopole at Solid Rock Church to that which is predicted for a 150' monopole at the Fire Department Museum (Exh. P), it can hardly be said with a straight face that the coverage at the Fire Department Museum is any less comprehensive than that which is asserted would be provided by the Solid Rock Church site. The difference is that a facility at one site would allegedly provide the Southwest section less than the signal strength which Omnipoint has claimed is necessary to constitute “coverage,” and a facility at the other location would allegedly leave out an area to the Northeast. However, the gross coverage provided to an otherwise ‘uncovered’ area is at least comparable for each location.

Without splitting hairs, it is clear that Omnipoint has not established as an undisputed fact that the Fire Department Museum site is not “feasible.”

e. Omnipoint Failed to Consider Alternate Sites Which Would Provide Alternate Means to Providing Coverage.

Because Omnipoint limited its approach to one strictly molded to meets its own design preferences, it has not advanced the type of ‘outside the box’ analysis which is required to

establish as a matter of fact or law the non-existence of feasible alternative. Mr. Maxson has, in sum, confirmed the limitations of Omnipoint's thought processes and, in the process, made it abundantly clear that there are numerous issues of material fact which preclude summary judgment based upon the assertion that the Solid Rock Church represents the only feasible site to remedy the asserted coverage gap.

Omnipoint has not established as an undisputed fact that there are no alternative sites, even if this Court accepts the claim that there is a significant gap.

## III. CONCLUSION

For the foregoing reasons, Defendants respectfully suggest that there are numerous issues of material fact in this matter which preclude the granting of Summary Judgment in Omnipoint's favor.

Defendants, therefore, respectfully pray that the Court deny Omnipoint's Motion for Summary Judgment.

Respectfully submitted,
Defendants,
By and through their counsel,

Dated: January 4, 2008

/s/ Jeffrey S. Michaelson

Jeffrey S. Michaelson, Esq. (#3299)
Michaelson & Michaelson
P.O. Box 622
North Kingstown, R.I. 02852
Telephone: (401) 295-4330
Facsimile: (401) 295-5220

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date of filing of this document(s).

/s/ Jeffrey S. Michaelson