UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| OMNIPOINT HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF CRANSTON, THE ZONING BOARD OF REVIEW OF THE CITY OF CRANSTON and JOY MONTANARO, EDWARD DIMUCCIO, CURTIS PONDER, FRANK CORSO III, and DONALD CURRAN in their capacities as members of the City of Cranston Zoning Board of Review,<br><br>Defendants. | ) | C.A. No. 06-531-ML-DLM |

DEFENDANTS' POST TRIAL MEMORANDUM[1]

In this suit, Omnipoint relies solely and exclusively on the provisions of the Telecommunications Act which preclude a municipality from preventing the placement of a wireless facility where such a denial "prohibit[s] or ha[s] the effect of prohibiting the provision of personal wireless services." 47 U.S.C. Sec. 332(c)(6)(B)(i)(II). Omnipoint has *not* asserted, in this suit, any procedural or substantive defect in the zoning ordinance or the substantive or procedural due process it was afforded in the City of Cranston in its denial of Omnipoint's application for a permit and variance to locate a facility at the Solid Rock Church.

In order to prevail, Omnipoint has the burden of establishing two elements: First, the existence of a 'significant gap' in coverage. *Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002).[2] Second, because Omnipoint's claim is based on a

[1] Defendants file this Post Trial Memorandum in lieu of closing arguments. The arguments contained in this Memorandum are based upon counsel's notes and recollection of the evidence in this matter. Obviously, to the extent that the Court's recollection of the evidence differs, it is the Court's recollection, as factfinder, which controls.

[2] Additional citations are set forth in Defendants' Pretrial Memorandum and Memorandum in Opposition to Motion for Summary Judgment.

particular decision (as opposed to a blanket prohibition contained in an ordinance) Omnipiont must prove that the "existing application is the only feasible plan" to remedy the gap. *Cellco Partnership v. Town of Grafton*, 336 F.Supp.2d 71, 83 (D.Mass. 2004), *citing Second Generation*, 313 F.3d at 630.

Defendants have no burden: "We doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower, simply to defend themselves from an easily made accusation in court that an individual denial of a permit amounts to an effective prohibition." *Nat'l Tower, LLC v. Plainville Zoning Bd.*, 297 F.3d 14, 24(1st Cir. 2002).

A. Omnipoint Has Not Proven The Existence Of A Significant Coverage Gap.

"A gap in wireless services exists when a remote user of those services is unable to either connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication.'" *Omnipoint Communications v. Town of Lincoln*, 107 F. Supp.2d 108, 118-19(D.Mass. 2000).[3]

There is no statutory or regulatory criteria which establish that a signal strength below a particular level establishes the existence of a coverage gap. In *Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Bd. of Easttown Twnshp.*, 331 F.3d 386 (3rd Cir. 2003) the Court noted that, in the District Court, Omnipoint's claim that a signal better than -85 dBm is required to provide reliable service was rejected by a United States Magistrate Judge. "The Magistrate Judge therefore concluded that where the drive test data does not support the expert opinion that weak signal strength results in unreliable service, Omnipoint has not met its burden of

[3] A "significant gap" must be contrasted with "a mere, and statutorily permissible, dead spot. Federal regulations contemplate that areas enjoying adequate coverage will still include spots without reliable service." *Second Generation* at 631, *citations omitted*.

establishing a significant gap in coverage." *Omnipoint v. Easttown*, 331 F.3d at 398-99.[4]

1. Omnipoint's Self-Selected -84dBm Criteria Does Not Establish "Coverage."

In this case, Mr. Luutu testified that he uses the threshold of -84dBm because it is given to him as a design criteria. He believes it is based on Omnipoint's using a complicated computer program which equates that signal strength with a 95% level of "reliability." Reliability was described by Mr. Marquis as the ability to make, continue, keep and hold a call from intended start to intended finish, including any necessary 'handoffs' between cell sites. Mr. Luutu did not know much, if anything about the computer program and made no test whatsoever to confirm that reliability of service, as defined, correlated, in this instance or any other instance, with the signal strength he was required to design to.

The 'reliability standard,' according to Mssrs. Marquis, Luutu and Maxson, is not a statutory or regulatory requirement but rather, as Mr. Marquis described it, Omnipoint's "goal" which Omnipoint aspires to.[5] Mr. Marquis testified that Omnipoint aspires to this 'reliability' goal even where signal strength is less than -84dBm, thus establishing (consistent with Mr. Maxson's testimony) that 'reliability' and signal strength are not directly correlated. Moreover, there was no evidence which establishes that either a -84dBm signal strength or a 95% reliability figure *ipso facto* establishes as a matter of fact or law a lack of 'adequate' or 'reliable' service. Mr. Maxson

[4] This discussion in *Easttown* was in the form of *dicta*, because the Court's main concern was whether a gap is to be considered only based on the applicant's service, or the service of other providers in the area. *Omnipoint v. Easttown*, 331 F.3d at 399. However, it does seem fair to suggest that the Third Circuit had no qualm with the rejection of -85 dBm as the yardstick by which 'coverage gaps' are measured.

[5] Mr. Marquis testified that federal licensing required that service be provided, but did not know what, if anything, Omnipoint may have submitted to the FCC to establish such service. Respectfully, where Omnipoint relies on its licensing obligation, but fails to offer evidence on how it reported to the FCC that it met that requirement, it has failed to provide evidence which establishes whether a coverage gap, in fact, exists.

testified that his experience demonstrates that reliability exceeding 95% has been found to exist at lesser signal levels in the area of -92dBm.

Thus, Omnipoint has failed to establish that its -84dBm goal establishes a threshold of adequate, reliable or, indeed, any level of service. Omnipoint likewise offered no evidence of what signal strength it claims would correlate with, for example, 90%, 85% or any other 'level' of reliability or what areas within the claimed coverage gap have actual reliability in *any* measured range. Compounding this shortcoming, Omnipoint offered the Court no propagation models which establish existing or predicted coverage at *any* signal strength/claimed "reliability" level other than at its own self-defined threshold. Thus, Omnipoint's entire case is built upon the illusory foundation that -84dBm is the minimum signal strength which establishes "coverage."

In asserting that a -84dBm signal strength is a viable measure of reliability of service, Mr. Luutu testified about a 'link budget' which started with a receiver sensitivity of -102dBm and then accounted for fade, body and penetration losses to come up with a minimum sensitivity. This approach suffered from a number of infirmities and should not be relied upon by the Court in determining whether -84dBm establishes anything about service.

First of all, Mr. Maxson was not permitted to testify as to his opinion is regarding minimum receiver sensitivity, but it is counsel's recollection that he did testify that he did not agree that -102dBm was the minimum receiver sensitivity. Mr. Luutu relied on a vague 'industry' standard, but provided no specifics to support his figure. Furthermore, Mr. Maxson explained that Mr. Luutu's link budget 'double' counted certain losses, such that Mr. Luutu's total signal losses of -17dBm double counted, for example, body loss and vehicle penetration loss.

In addition, based on the logic implied by the 'link budget' which Mr. Luutu testified to, at signal strengths less than -84dBm there would be an abrupt loss of service by the receivers – if

their sensitivity were -102dBm and Mr. Luutu's assumptions were correct regarding combined losses in a vehicle, an exterior signal strength of less than -84dBm would be *undetectable by receivers in a vehicle*. However, as clearly depicted in Mr. Luutu's own drive test data, Exh. 7, the receivers were fully capable of detecting signal strengths substantially weaker than -84dBm.

Mr. Marquis' testified that it is Omnipoint's goal to have 95% reliability even where signal strength is less than -84dBm and Mr. Maxson testified that he had observed reliability testing where greater than 95% reliability existed at signal strengths lower than -84dBm. Thus, it seems clear that the ability of telephones to communicate successfully with the network does not depend on the existence of a -84dBm signal strength.

In sum, Omnipoint put all of its eggs, so to speak, in the -84dBm basket, but failed to prove that signal strength at that level or better is required to establish "coverage."

2. <u>Omnipoint Has Not Proven The Existence Of A "Significant" Area In Dispute.</u>

The scope and breadth of a 'significant' gap in coverage is not defined by statute or regulation. In labeling the area at issue as a "significant" gap, Mr. Luutu used his own subjective judgment. Much of Mr. Luutu's testimony hinged on the accuracy of Exhibit 7, the so-called drive test data, and clearly focused his design effort and his preference for the Solid Rock Church site on the desire to provide coverage to Phenix Avenue. However, Exhibit 7, the drive test data is contradicted by other evidence in the case and should not be accepted as accurately depicting existing network configuration and coverage.

Mr. Luutu's testimony that the drive test was conducted after the Radiophone facility, PR636, was in service is rendered highly suspect by other evidence, and this Court should conclude that this recollection was mistaken. In Exhibit 7, a significant portion of Phenix Avenue running North and East of the proposed Solid Rock Church site (PR646 on that Exhibit) are

depicted as having signal strengths of less than -84dBm (depicted in red and blue). However, a review of Exhibit 5 shows that much of this area has coverage at better than -84dBm. As Mr. Maxson testified, this coverage comes from PR636, the Radiophone facility and/or RI151.[6] More telling is the drive test data showing Hope Road, to the North of Phenix Avenue which, as Mr. Maxson also testified, receives signal from PR636. The drive test data show substantial areas of Hope Road with signal strengths claimed to be less than -84dBm, yet Exhibit 5 clearly shows that, with Radiophone being 'online,' this area has better than -84dBm coverage.[7]

Mr. Luutu testified that a wireless facility in Omnipoint's network, located in Coventry, provides 'some' coverage within the South/West area he identifies as the 'coverage gap,' but he describes it only in very general terms. Omnipoint did not provide *any* evidence of what portion of the purported gap is covered by Coventry, none of Omnipoint's exhibits depict this coverage and, thus, the evidence which Omnipoint has offered this Court is incomplete and inconclusive.[8]

There is abundant evidence that, for much of the area which Omnipoint claims has less than -84dBm signal strength, there is, in fact, stronger signal. Thus, Omnipoint has failed to prove the existence of a "significant" area where coverage is less than its own self-selected threshold.

---

[6] Exhibits G and H also demonstrate that RI151 provides coverage better than -84dBm in the portion of Phenix Avenue in the far North and East sections of the area in dispute.

[7] Exhibit L, Mr. Luutu's September 13, 2007 report, also makes it highly unlikely that the Radiophone facility was 'online' as of that date. The report makes reference to the fact that Omnipoint "is installing antennas" on an existing lattice tower "approximately one and a half miles northwest of the property," makes reference to "soon-to-be installed antennas" and refers to a redundancy issue between the Country Club sites and the "facility being installed on the lattice tower northwest of the Property." (All references from Page 3 of Exhibit L).

[8] Exhibit K, Omnipoint's online "coverage check" indicates "two bar" coverage for all of the Phenix Avenue area in question *except* for the portion nearest Coventry, which shows only "one bar."

B. Omnipoint Has Not Proven That Solid Rock Church Is The Only Feasible Site.

Omnipoint has failed to prove that each of the sites identified as viable were not feasible.

There were two locations at the Cranston Country Club which were allegedly not available, based solely on Omnipoint's self-selected monetary parameters. Omnipoint offered 'its' own maximum monthly payments and went to its own self-imposed limit on a cash 'sweetener' to entice the Country Club owners.

The Court questioned whether there is any caselaw establishing that the 'sky is the limit' in terms of what a provider must offer to establish a site is not feasible, which there isn't. However, there is similarly no principle of law which establishes that a provider's own self-imposed budget establishes infeasibility. Omnipoint gave no evidence based upon which this Court could conclude that a rejected cash offer of twenty-five thousand dollars establishes infeasibility. Considering that Omnipoint was prepared to enter into a lease which provided for up to twenty years leasing (Exhibit D) at $2,000.00 per month, with an inflation adjustment (per Ms. Cordova) – a total nearing or exceeding $500,000.00 – 'stopping the bidding' at $25,000.00, respectfully, proves nothing.[9] Furthermore, Omnipoint offered no evidence of a similar sweetener being offered to cross the fairway to install a wireless facility on a power line.

The Fire Department Museum, identified by the site acquisition team as viable and evidently available, was rejected because its predicted coverage overlapped the Radiophone facility. Mr. Luutu testified at trial that the coverage which would be afforded by any of the three alternative sites would not 'remedy the gap,' but Exhibit L, his report, indicates that the objection

[9] Omnipoint's preference for the Solid Rock Church site may be explained by the fact that that proposed lease was for not more than $1,500.00/mo. (Exhibit C) and didn't require payment of any cash 'sweetener.'

to the site was based on redundancy of coverage.[10]

As noted in *Cellco*: "... the TCA does not offer providers the best or cheapest option." *Cellco*, 336 F.Supp.2d at 85, *citing, generally, Amherst*, 173 F.3d at 15. Omnipoint has failed to consider and prove that there are no feasible alternatives, even if not as economically satisfying. That failure defeats Omnipoint's contention that the denial of a site at Solid Rock Church constitutes an effective prohibition. *See, Second Generation*, 313 F.3d at 635

C. Omnipoint Did Not Fully Explore Other Feasible Options.

"For a telecommunications provider to argue that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a *full* effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers." *S.W. Bell Mobile Sys. v. Todd*, 244 F.3d 51, 59-60 (1st Cir. 2001)(emphasis added), *cited in National Tower*, 297 F.3d. at 24. To prevail, a carrier must prove that its proposed solution is the only "technically feasible" option. *Cellco*,, 336 F.Supp.2d at 83, *citing Amherst*, 173 F.3d at 15. In other words, Omnipoint cannot rely on self-serving parameters which they claim point to a single feasible alternative.

In this case, that is exactly what Omnipoint has done – they set their own self-serving signal strength goal as the floor, set a single site macro cell solution as the only option, limited their search to 'easy' sites within an unnecessarily restricted search ring and set monetary limitations which suit their own profit motive. The law, respectfully, does not condone or mandate overriding lawful zoning decisions simply because they are inconsistent with a carrier's preferences. A provider must be willing to consider and present to localities other feasible

[10] Mr. Luutu's report, Exhibit L, suggests that 'radiophone interference' disqualified the Fire Department Museum site but testified, it is counsel's recollection, that that reference related to a redundancy issue with the Radiophone facility.

alternatives available to them, even those that entail using lower towers and multiple site solutions.[11] *Amherst*, 173 F.3d at 14-15.

Omnipoint's evidence established that the entire search and design approach utilized was restricted to a 'single site' solution: Mr. Luutu testified that he issued a single 'search ring,' Exhibit B, which was sent on to a site acquisition team. This decision drove the entire process and its results cannot support the conclusion that one site identified in that process is the only feasible site to address the claimed coverage gap.

As Mr. Maxson testified, and as depicted on Exhibit B, a ridge runs approximately North/South in the direct vicinity of the Solid Rock Church, making that site attractive as a single site solution to serve both 'downhill' sides of the ridge. However, as Mr. Maxson testified, and as the Court can readily conclude, if the approach, instead, effectively 'split the ridge,' and took a multi-site approach, it is more likely than not that the process employed would have established two search rings which would not have been coincident with the single search ring depicted in Exhibit B. Under those circumstances, the Site Acquisition team, as testified to by Mr. Marquis, Ms. Cordova and Mr. Walsh, would have searched in *different* geographical areas than they did for *two sites*. By sticking to a single site solution, Omnipoint failed to prove that its proposed site is the only feasible alternative to address a claimed lack in coverage.[12]

Furthermore, Omnipoint has not offered evidence that it considered other than macrocell

[11] Omnipoint's counsel made a point, in cross-examining Mr. Maxson, that the Governor's Hill tower was in Warwick. The *Cellco* Court specifically noted that cell sites outside the town involved in that lawsuit should be considered in determining whether feasible alternatives exist. *Cellco*, 336 F.Supp.2d at 84.

[12] Exhibits G, H, and 5 illustrate that a site West of the 'ridge' would provide substantial coverage in the portion of Phenix Avenue South and West of the proposed Solid Rock Church site.

solutions – Mr. Maxson testified that there are various alternatives to this approach, aside from multiple macrocell sites, including various microcell solutions, distributed antenna systems, and Mr. Maxson identified a tower not even considered by Omnipoint as a potential source of coverage. Mr. Maxson identified power line poles not considered by Omnipoint and testified that carriers are given access to such poles by FCC requirements.[13]

Omnipoint did not consider roaming, despite the fact that Mr. Marquis testified the roaming provides the subscriber with the same wireless service in terms of making and receiving calls.

Omnipoint has not proven that it fully explored all feasible alternatives and thus has failed to prove that the Solid Rock Church site is the only feasible alternative.

D. Conclusion.

For the foregoing reasons, Defendants in this matter respectfully submit that Plaintiff has not met its burden of proof and has not established that the City of Cranston, acting through its lawfully constituted municipal mechanisms and in appropriately denying the special use permit and dimensional variance consistent with its lawful ordinances, effectively prohibited Omnipoint from providing service in the area of a legally significant coverage gap. Omnipoint has presented evidence only of what it 'wants,' not what it 'needs.' Accordingly, Defendants respectfully pray that the Court enter judgment in favor of Defendants denying and dismissing Plaintiff's claims and award Defendants their costs in the defense of this suit.

[13] In cross-examination Mr. Maxson was asked if he knew if the poles were available. Respectfully, it is Omnipoint's burden to prove that it explored this option.

Respectfully submitted,
Defendants,
By and through their counsel,

Dated: July 16, 2008

/s/ Jeffrey S. Michaelson

Jeffrey S. Michaelson, Esq. (#3299)
Michaelson & Michaelson
P.O. Box 622
North Kingstown, R.I. 02852
Telephone: (401) 295-4330
Facsimile: (401) 295-5220

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date of filing of this document(s).

/s/ Jeffrey S. Michaelson