UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

OMNIPOINT HOLDINGS, INC.,

Plaintiff,

v.

THE CITY OF CRANSTON, THE ZONING BOARD OF REVIEW OF THE CITY OF CRANSTON and JOY MONTANARO, EDWARD DIMUCCIO, CURTIS PONDER, FRANK CORSO III, and DONALD CURRAN in their capacities as members of the City of Cranston Zoning Board of Review

Defendants.

Civil Action No. 06-531ML

**PLAINTIFF'S POST-TRIAL MEMORANDUM**

Plaintiff, Omnipoint Holdings, Inc. ("Omnipoint") has met its burden of proving, by a preponderance of the evidence, that the City of Cranston Zoning Board of Review, ("the Board") has effectively prohibited Omnipoint from remedying a significant gap in its wireless coverage in Cranston, in violation of the Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(i), by denying Omnipoint's application, submitted pursuant to the City of Cranston Zoning Ordinance ("Zoning Ordinance") for a dimensional variance and a special use permit to construct, install, operate and maintain a wireless telecommunications service facility on property located at 1753 Phenix Avenue, Cranston, Rhode Island ("the Property"). Based upon the evidence it submitted at trial, Omnipoint has demonstrated that it has a significant gap in its wireless coverage and its proposed site at the Property constitutes the only feasible alternative for providing service to the area affected by the gap.

To succeed on a claim for effective prohibition under the TCA, a wireless provider must establish that: a) the town's zoning policies and decisions have resulted in a "significant gap" in wireless services within the town; and b) "further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." AT&T Wireless PCS, LLC v. Town of Charlestown, et al., 2005 U.S. Dist. LEXIS 12694 at * 43-44 (D.R.I. Mar. 2, 2005) (citations omitted). Review of a zoning board's decision under the anti-prohibition standard is de novo. District Courts need not accord any deference to the local board's decision. The Court can find an effective prohibition "even if substantial evidence exists to support the denial of an individual permit under the terms of the town's ordinances." National Tower, LLC, et al. v. Plainville Zoning Board of Appeals, et al., 297 F. 3d 14, 20-22 (1st Cir. 2002).

**Omnipoint Proved That It Has A Significant Gap in Coverage in Cranston**

"A gap in wireless services exists when a remote user of those services is unable to either connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication." Cellco Partnership v. Town of Grafton, 336 F.Supp.2d 71, 82-83. (D.Mass. 2004). The "existence of a coverage gap means that there is currently not enough signal strength to allow Cellco customers reliably to initiate or hold calls when located within ***or traveling through*** these areas of Grafton." Cellco, at 73. The Court may consider, in determining whether a "significant gap" exists, whether the area sought to be covered is a "heavily traveled commuter thoroughfare". Omnipoint Communications MB Operations, LLC v. Town of Lincoln, 107 F. Supp. 2d 108, 199 (D. Mass. 2000), Cellular Telephone Co. v. Zoning Board of Adjustment of the Borough of Ho-Hokus, 197 F.3d 64 (3rd Cir. 1999); See also, National Tower, LLC v. Frey, 164 F.Supp.2d 185, 188 n. 1 (D.Mass 2001).

The testimony of Omnipoint's radio frequency expert, Elijah Luutu, supported by Omnipoint's trial exhibits, clearly demonstrates the existence of a significant gap in coverage within Cranston. Mr. Luutu has spent his career designing wireless facilities and designing wireless networks. He has provided full-time consulting services to several major wireless carriers, employing both GSM and CDMA technologies. With a background in computer engineering, he has utilized a variety of computer modeling tools over the last twelve years to forecast radio frequency coverage on behalf of the wireless carriers. In addition, he has considerable experience "on the ground", confirming his computer modeling by gathering empirical drive test data and, when necessary, optimizing the frequency range of facilities within a wireless network by making adjustments to antennas within the network.

Mr. Luutu employed both computer modeling and drive testing in determining the existence of a coverage gap within Cranston. Mr. Luutu's computer models, submitted as Exhibits 5 and 6, demonstrate the existence of a coverage gap along Phenix Avenue, a major thoroughfare connecting the southern portion of Cranston with the towns of Coventry and West Warwick, and within the area bordered by Hope Road and Burlingame Avenue in southern Cranston. Mr. Luutu confirmed the accuracy of his modeling by gathering drive test data, submitted as Exhibit 7. The substantial coverage gap was further confirmed by dropped call data generated by Omnipoint's network and corroborated by Defendants' Exhibit B, which references Omnipoint's dropped call problems in the Phenix Avenue area.

Mr. Luutu testified that Omnipoint's coverage gap is "significant" because of Phenix Avenue's role as a connecting thoroughfare between neighboring towns. As Mr. Luutu testified, Omnipoint's customers traveling within the affected area will not be able to reliably initiate or hold a call without the construction and installation of the site Omnipoint proposes. Based upon

on its exhibits and Mr. Luutu's testimony, Omnipoint has met its burden of proving the existence of a significant gap in coverage in Cranston.

Defendants introduced neither their own drive test data nor their own computer models to contradict Mr. Luutu's models or empirical drive test data. They argue, instead, that Omnipoint's reliance on a design standard of -84dBm to provide reliable coverage to customers traveling in their cars somehow negates Omnipoint's evidence supporting the existence of a significant gap. Despite the undisputed evidence that, wireless carriers set their own design standards for the purpose of providing reliable coverage to their customers because there is neither federal, state or local statute or regulations setting a design standard, defendants seek support for their position in a wholly inapposite Third Circuit case. [1]

Omnipoint provided ample justification for its design standard. Gerald Marquis, Regional Real Estate Manager for Omnipoint, testified that Omnipoint seeks to provide ninety-five percent reliability, on a nation-wide basis, for its customers seeking to place and hold a call within a given coverage area. Mr. Marquis testified that this degree of reliability is driven by the competitive nature of the wireless market. Mr. Luutu testified that Omnipoint, supported by standards established by the European Telecommunications Standards Institute, sets its design standard at -84dBm for in-vehicle coverage in order to meet its reliability objective. Defendant attempts, through the testimony of David Maxon, to cast doubt upon Omnipoint's design standard and reliability objectives. Defendants' evidence fails to support their attack on Omnipoint's design standard. They contend, for example, without basis in science or relevant literature, that Omnipoint somehow "double counted" the components giving rise to the design

---

[1] In Omnipoint Communications v. Zoning Board of Easttown, cited by Defendants, the Third Circuit Court of Appeals makes reference, in dicta, to factual findings of the lower court's Magistrate Judge, who evaluated whether there was reliable cellular phone service based upon dropped call data and found that the dropped call data did not support the expert's opinion regarding the need for stronger signal strength. Those facts are not present here. In no way does the Easttown case rest on a Magistrate Judge's evaluation of whether -84dBm is, as a matter of law, a reasonable design standard for in-vehicle coverage. Rather, the Magistrate Judge indicated, as Omnipoint readily concedes, that there is no regulatory standard requiring a minimum signal strength.

standard. Astonishingly, when plaintiff's counsel asked Mr. Maxon whether he viewed it reasonable for carriers to seek to provide reliable coverage to its customers, (defined, at Mr. Maxon's request, by plaintiff's counsel, as the ability to make, maintain and complete a call within a coverage area) he replied "no". Given this apparent disregard for the imperatives of the competitive market among wireless carriers, Mr. Maxon's testimony regarding the reasonableness of Omnipoint's reliability objective and its corresponding design standard should be given little, if any, weight. Without credible testimony or evidence supporting Defendants' efforts to cast doubt upon Omnipoint's design standard and reliability objective, Omnipoint's evidence with respect to its significant coverage gap is essentially uncontested.

**Omnipoint Proved That It The Proposed Site Is The Only Feasible Alternative to Remedy Its Coverage Gap Along Phenix Avenue in Cranston**

To establish that a permit denial is impermissible because there are no alternative sites, an applicant "must develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers." Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F. 3d 51, 63 (1st Cir. 2001). A carrier's unsuccessful efforts to obtain a lease for otherwise suitable property is a factor for the Court to consider in determining whether such an effort has been made. Omnipoint Holdings, Inc., v. Town of Westford, 206 F.Supp.2d 166, 168. The defendant Board, once confronted with the carrier's evidence that no alternative sites exists, must show either that the carrier's evidence is factually insufficient, or come forward with evidence of its own demonstrating a trial worthy dispute". Westford, at 172; National Tower, LLC v. Frey, 164 F.Supp.2d 185, 190 (D.Mass. 2001).

Omnipoint site acquisition specialists, Shayana Cordova and Michael Walsh, described their efforts to find suitable towers, structures or raw land sites on which Omnipoint could construct a facility at a height suitable to meet the company's coverage objectives. They and Mr.

Luutu testified that, because PCS carriers, like Omnipoint, use a lower signal and a much higher frequency than traditional cellular technology, the range between Omnipoint's mobile telephones and the antennas is limited. Given Omnipoint's FCC-designated frequency, its usual and optimum range for radio frequency propagation is one and a half miles, with yields lessened by building density, terrain and tree cover. Mr. Luutu testified, with support from Exhibit 10, that no existing towers within three miles of the proposed site could be used to remedy Omnipoint's coverage gap because of either insurmountable distance or elevation problems.

Ms. Cordova and Mr. Walsh found one potential structure and three potential "raw land" sites within the affected coverage area from which Omnipoint might be able to address its coverage needs: 1) a power pole at the Cranston Country Club on which antennas might be mounted; 2) an area at the Cranston Country Club on which a ninety foot monopole might be constructed; 3) property owned by the City of Cranston Fire Department Museum; and 4) the Property owned by the Solid Rock Baptist Church. Neither Country Club site was available for lease following unsuccessful lease negotiations. Defendants argue that offering $25,000 to the owners as an inducement to enter the lease was insufficient evidence of the diligence of Omnipoint's efforts to obtain lease rights necessary to construct a wireless facility. They failed, however, to demonstrate that the property was available at some higher figure.

Mr. Luutu rejected the Cranston Fire Department Museum as a potential site because his computer modeling revealed that it provided coverage that overlaps coverage from the Omnipoint's Radiophone tower to the northeast of the proposed site at the Solid Rock Church. Exhibit 9 illustrates the overlap in coverage. Further, Exhibit 9 supports Mr. Luutu's opinion that the proposed monopole at the Solid Rock Church Property would still be necessary to remedy the coverage gap along the southern portion of Phenix Avenue even were the Fire Department site constructed.

Mr. Luutu testified, based upon his experience in network design, his review of computer models, his drive testing to confirm his models, his observations of the terrain and tree cover at the Property, his review of computer models as well as height and elevation data for other sites in the subject area, and Omnipoint's inability to obtain either site at the Country Club, that the only feasible alternative for remedying Omnipoint's coverage gap along the direct travel routes between Cranston and West Warwick and Coventry is to place antennas on a ninety foot monopole at the Property. His testimony, in conjunction with Omnipoint's trial exhibits and the testimony of Mr. Walsh and Ms. Cordova regarding their efforts to find a feasible site, demonstrate that Omnipoint has met its burden of proving that it made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers.

Defendants rely entirely on the testimony of David Maxon in an effort to refute Omnipoint's evidence. His opinions must be evaluated in the context of his meager qualifications to render an opinion in the field of wireless network design, his failure to offer any computer modeling or empirical testing to support his opinions and, most importantly, the fact that he rendered an opinion in this case without having conducted testing or even visiting the site. Moreover, to the extent he offers alternatives to Omnipoint's proposed site, he offers no evidence that there is any other site that is factually available or technically feasible.

In contrast to Mr. Luutu, who has spent his career as a radio frequency engineer designing wireless networks and wireless facilities, Mr. Maxon held a part-time consulting position with a single wireless carrier more than ten years ago. He conceded that he had no experience in the field of wireless network design or wireless facility design but rather, that he serves as a consultant to municipalities, like Cranston, with respect to their wireless issues.

Mr. Maxon further conceded that, notwithstanding his criticism of how Mr. Luutu conducted drive testing, he conducted no drive testing of his own. In the same vein, he criticizes Mr. Luutu's computer modeling without offering any of his own to refute it.

Most telling with respect to Mr. Maxon's lack of credibility is his admission that, at the outset of his retention on behalf of the City of Cranston, he crafted an affidavit, (used as Defendants' expert disclosure in this case and never supplemented) in which he opined that Omnipoint did not have a significant coverage gap in the vicinity of its proposed site and that it had failed to exhaust alternative, feasible sites. He reached these opinions without gathering any empirical data through drive testing and indeed, without even visiting the proposed site. When asked, at trial, whether he had undertaken any computer modeling in the course of coming to the opinions in his affidavit/expert disclosure, he said he "did not recall". He has offered no computer modeling, from either before or after the time he drafted his affidavit, to dispel the notion that he simply prefers a failure of recollection to admitting that he undertook no computer modeling to reach his opinions.

Mr. Maxon offered several theoretical alternatives to the proposed site, largely in the form of theoretical "multiple site", "multi-cell" or Distributed Antenna System ("DAS") proposals. He failed, however, to demonstrate how his theories could be converted into **feasible alternatives.** At every turn, he conceded he had made no inquiry into the availability of such sites, no engineering study with respect to them, and no actual analysis of whether his theories would obviate the need for the site proposed by Omnipoint to remedy its coverage gap. His "alternatives" therefore should be given no weight.

Defendants' argument with respect to a roaming agreement is similarly unavailing. Notwithstanding the testimony of Omnipoint's Gerald Marquis that the carrier does not enter roaming agreements in areas where it has a license and certainly cannot enter an agreement with

respect to a single site within a network, Defendants still argue that a roaming agreement is an alternative that Omnipoint failed to consider, regardless of its lack of feasibility.

Nowhere was the fact that the Defendants argued in favor of alternative sites that were neither available nor technically feasible more apparent that with respect to Mr. Maxon's claim regarding a possible DAS alternative, [2] which surfaced some time after he submitted his expert disclosure. Mr. Maxon conceded that, while DAS utilizes fiber optic cables strung between utility poles to carry signals, he had undertaken no engineering study with respect to the availability of such poles in Cranston or whether this "alternative" might remedy Omnipoint's coverage gap.

Mr. Luutu's wireless network design experience, his computer modeling, his empirical drive testing and his familiarity with the site at issue far outweighs Mr. Maxon's pre-determined, and baseless opinions with respect to both the existence of a significant gap in coverage and with respect to the existence of a single, feasible alternative—the Solid Rock Church site, to remedy that gap.

---

[2] Maxon's testimony with respect to a DAS alternative was offered over Plaintiff's objection. Plaintiff had objected, (which objection was sustained by the Court) to defense counsel's efforts to cross-examine Mr. Luutu with respect to whether he had considered a DAS alternative. Counsel objected on the basis that DAS is an alternative, non-wireless technology, and as a technology choice, is solely within the jurisdiction of the FCC and not grounds for a local zoning board to deny a site sought by a wireless carrier for zoning relief.

Federal authorities have repeatedly emphasized the FCC's exclusive jurisdiction over all aspects of the wireless industry. For example, the TCA provides that the Act serves to "maintain control of the United States over all the channels of radio transmission and to provide for the use of such channels ...under licenses granted by Federal authority." 47 U.S.C. s. 301. The Supreme Court has stated that the "(FCC)'s jurisdiction over technical matters" is "clearly exclusive." Head v. New Mexico Board of Examiners in Optometry, 374 U.S.424, 430 n. 6 (1963), citing 47 U.S.C. s. 301; See also National Association of Regulatory Utility Commissioner v. F.C.C., 525 F. 2nd 630, 636 (D.C. Cir. 1976) (Congress intended to grant the FCC broad discretion concerning its authority to reulate radiotelephone service); Sprint Telephony PCS, L.P. v. County of San Diego, 377 F. Supp 2nd 886 (S.D. Cal 2005) (Aff'd. on other grounds), 2007 U.S. App. Lexis 13811 (9th Cir. 2007) (finding that an ordinance purporting to regulate antennas regardless of where they were located within a municipality was preempted by Section 253 of the TCA).

Federal control over wireless deployment is so pervasive as to be preemptive. The TCA carves out, from this preemption, local zoning authority over traditional issues such as setbacks, height limitations and site selection. 47 U.S.C. s. 332 (c)(7)(A). Local government's authority to require consideration of DAS would survive pre-emption only if it constitutes an exercise of this traditional zoning function. DAS, however, is a technology choice, not a zoning function.

Accordingly, this Court should find in Omnipoint's favor and order the relief it seeks.

Respectfully submitted,

OMNIPOINT HOLDINGS, INC.

By its attorneys,

/s/ Paul Cantor
Paul Cantor, Esq.
RI Attorney #3177
321 South Main Street, #302
Providence, RI 02903
Telephone: (401) 351-8200
Fax Number: (401) 351-9032

/s/ William A. Worth
William A. Worth, Esq.
PRINCE, LOBEL, GLOVSKY & TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
Telephone: (617) 456-8000
Fax Number: (617) 456-8100

Date: July 23, 2008

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 23, 2008.

/s/ William A. Worth